No. 24-2027

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,

v.

SAFEHOUSE, a Pennsylvania nonprofit corporation; and JOSÉ BENITEZ, as President and Treasurer of Safehouse, *Appellants*.

---

SAFEHOUSE, a Pennsylvania nonprofit corporation, *Appellant*,

v.

U.S. DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; and JACQUELINE C. ROMERO, in her official capacity as U.S. Attorney for the Eastern District of Pennsylvania, *Appellees*.

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 19-cv-519
District Judge Gerald A. McHugh

---

## BRIEF OF APPELLANTS SAFEHOUSE AND JOSÉ BENITEZ AND JOINT APPENDIX VOLUME I (Appx1–Appx10)

Ilana H. Eisenstein
Ben C. Fabens-Lassen
DLA PIPER LLP (US)
1650 Market St., Ste. 5000
Philadelphia, PA 19103
(215) 656-3300

Ronda B. Goldfein
Adrian M. Lowe
AIDS LAW PROJECT OF
PENNSYLVANIA
1211 Chestnut St., Ste. 600
Philadelphia, PA 19107
(215) 587-9377

Peter Goldberger
LAW OFFICE OF
PETER GOLDBERGER
P.O. Box. 645
Ardmore, PA 19003
(610) 649-8200

Seth F. Kreimer
3501 Sansom St.
Philadelphia, PA 19104
(215) 898-7447

*Attorneys for
Appellants Safehouse
and José Benitez*

September 4, 2024

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION..................................................................3

STATEMENT OF THE ISSUES.......................................................................3

STATEMENT OF THE CASE...........................................................................4

    A.    Formation of Safehouse .........................................................................4

    B.    Safehouse's Proposed Overdose Prevention Site to Prevent Overdose Deaths and Combat the Opioid Crisis.......................................................6

    C.    Safehouse's Board and Religious Beliefs .............................................7

    D.    Threatened Prosecution for Violation of the Crack House Statute, 21 U.S.C. § 856(a)....................................................................................10

    E.    Burden on Religious Exercise..............................................................11

    F.    DOJ's Policy of Selective Enforcement of Section 856(a).................12

    G.    DOJ's Initial Complaint, and Safehouse's Initial Counterclaims.............14

    H.    First Round of Proceedings in the District Court .................................15

    I.    The Prior Appeal .................................................................................16

    J.    Proceedings on Remand ......................................................................16

SUMMARY OF ARGUMENT ........................................................................17

ARGUMENT ....................................................................................................20

I.    Safehouse Has Plausibly Alleged that It Is a "Person" Engaged in the "Exercise of Religion" under RFRA and the First Amendment. .................20

    A.    Standard of Review. .............................................................................21

    B.    Safehouse Properly Asserts RFRA and First Amendment Claims Based on the Religious Commitments of its Board Members...........22

    C.    Safehouse's Board Is Empowered by Pennsylvania Law to Establish the Nonprofit Corporation's Religious Beliefs .................29

    D.    Safehouse Has Plausibly Alleged that It Is Engaged in the Exercise of Religion under RFRA and the First Amendment. ...........35

II.    Safehouse's Religious Exercise Is Substantially Burdened by the
       Government's Threatened Prosecution .........................................................45

III.   Safehouse Has Asserted a Viable First Amendment Claim ..........................47

IV.    The District Court Erred by Denying Leave to Amend. ...............................53

CONCLUSION .....................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023)..........................................................................23

*Adams v. Gould Inc.,*
   739 F.2d 858 (3d Cir. 1984) ..............................................................53

*Africa v. Pennsylvania,*
   662 F.2d 1025 (3d Cir. 1981) .......................................................36, 38

*Arthur v. Maersk, Inc.,*
   434 F.3d 196 (3d Cir. 2006) ..............................................................53

*In re Burlington Coat Factory Sec. Litig.,*
   114 F.3d 1410 (3d Cir. 1997) ............................................................53

*Chosen 300 Ministries, Inc. v. City of Phila.,*
   12-cv-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012)...................39

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
   508 U.S. 520 (1993)............................................................24, 48, 53

*Clark v. Gov. of N.J.,*
   53 F.4th 769 (3d Cir. 2022) ......................................................48, 49, 51

*Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.,*
   879 F.3d 79 (3d Cir. 2018) ................................................................22

*Dahl v. Bd. of Trustees of W. Michigan Univ.,*
   15 F.4th 728 (6th Cir. 2021) ..............................................................50

*Davis v. Wigen,*
   82 F.4th 204 (3d Cir. 2023) ..................... 18, 22, 35, 36, 42, 43, 45, 46

*Fifth Ave. Presbyterian Church v. City of New York,*
   293 F.3d 570 (2d Cir. 2002) ..............................................................39

*Fulton v. City of Phila.,*
   593 U.S. 522 (2021).....................................................................48, 50

*Harbor Missionary Church Corp. v. City of San Buenaventura*,
    642 F. App'x 726 (9th Cir. 2016) ........................................................39

*Holt v. Hobbs*,
    574 U.S. 352 (2015)................................................................45, 46

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*,
    565 U.S. 171 (2012)........................................................................24

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)...........................................20, 47, 48, 52

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ........................................................43

*LeBoon v. Lancaster Jewish Community Center Association*,
    503 F.3d 217 (3d Cir. 2007) ...............................................26, 27, 28

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
    584 U.S. 617 (2018)........................................................23, 28, 29

*Micah's Way v. City of Santa Ana*,
    No. 23-cv-183 (C.D. Cal. May 9, 2023)................................................39

*Nunez v. Wolf*,
    — F.4th —, 2024 WL 3948020 (3d Cir. Aug. 27, 2024)......................18, 36, 41

*Patrick v. LeFevre*,
    745 F.2d 153 (2d Cir. 1984) ........................................................38

*Spivack v. City of Phila.*,
    109 F.4th 158 (3d Cir. 2024) .......................................................19, 47, 52

*Tandon v. Newsom*,
    593 U.S. 61 (2021)...........................................................48, 49, 51

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981)........................................................................43

*United States v. Armstrong*,
    517 U.S. 456 (1996)........................................................................51

iv

*United States v. Safehouse,*
    985 F.3d 225 (3d Cir. 2021) ............................................................4, 16

*United States v. Warren,*
    No. 17-00341, Dkt. 146 (D. Ariz. Nov. 21, 2019) ............................40

*W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.,*
    862 F. Supp. 538 (D.D.C. 1994) ............................................10, 39, 44

*Welsh v. United States,*
    398 U.S. 333 (1970) ........................................................................44

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ....................................................................45, 46

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ..........................................................45

*Zampogna v. L. Enf't Health Benefits, Inc.,*
    151 A.3d 1003 (Pa. 2016) ................................................................32

**Statutes and Regulations**

10 Pa. Stat. § 375(b) ..............................................................................34

15 Pa. Cons. Stat. § 5501 ......................................................................30

15 Pa. Cons. Stat. § 5721 ................................................................19, 30

19 Pa. Code § 41.4 ................................................................................32

21 U.S.C. § 856(a) ........................................................................*passim*

21 U.S.C. § 856(b) ..........................................................................11, 46

21 U.S.C. § 856(d) ................................................................................11

21 U.S.C. § 872(e) ................................................................................14

26 C.F.R. § 1.501(c)(3)–1(d)(2).............................................................34

26 U.S.C. § 501(c)(3)........................................................5, 17, 34, 35

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ................................................................................3

28 U.S.C. § 1345 ................................................................................3

42 U.S.C. § 2000bb–1 .......................................................................21

42 U.S.C. § 2000bb–1(a) ............................................ 17, 21, 22, 24, 35

42 U.S.C. § 2000bb–1(b) .................................................................22

42 U.S.C. § 2000bb–2(4) .............................................................25, 41

42 U.S.C. § 2000cc–5(7)(A) ......................................................18, 35, 41

42 U.S.C. § 2000e–1(a) ....................................................................27

## Other Authorities

Fed. R. App. P. 4(a)(1)(B) .................................................................1

Fed. R. Civ. P. 12(b)(6)....................................................3, 17, 21, 35

Fed. R. Civ. P. 15(a)........................................................................53

IRS Publication 5781, TG 3-3: Exempt Purposes - Charitable IRS
    Section 501(c)(3) (Feb. 1, 2024)..............................................34

Sharon Otterman, *Federal Officials May Shut Down Overdose
    Prevention Centers in Manhattan*, N.Y. TIMES (Aug. 8, 2023) ..................13, 50

## INTRODUCTION

For more than a decade, an opioid epidemic and overdose crisis have been devastating the Nation.  Since this litigation began in early 2019, more than 7,200 people have died of preventable opioid overdoses in Philadelphia alone.  Tens of thousands more continue to suffer in the grips of opioid addiction and substance use disorder.  To combat this crisis, Appellant Safehouse seeks to establish an overdose prevention center where drug users, particularly those suffering from opioid addiction, may remain under direct medical supervision and within immediate reach of critical, lifesaving care at the time of drug consumption, when the risk of overdose death is most acute.  Overdose prevention centers have been employed for over 35 years at more than 100 sites worldwide and have, through the medical-supervision model, prevented thousands of overdose deaths, reduced the spread of disease, administered essential medical care, and provided shelter and dignity to those suffering from addiction.

Safehouse's board members grieve for every life lost to overdose.  They believe, based on their deeply held religious convictions, that they have a duty to do everything possible to keep those individuals alive, even for one more day.  Their religious beliefs include a call to give shelter to the vulnerable and to treat them with dignity and humanity.  They seek to exercise these shared religious beliefs by opening an overdose prevention center in Philadelphia.

1

When Safehouse began its efforts, the U.S. Department of Justice (DOJ) responded by threatening Safehouse and its Board President, Appellant José Benitez, with civil and criminal enforcement under 21 U.S.C. § 856(a). This threatened to bar Safehouse and its board members from fulfilling their deeply held religious beliefs to provide those suffering from addiction with shelter and critical lifesaving care.

By imposing this burden on Mr. Benitez's and Safehouse's religious exercise, DOJ violated the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb–2000bb-4. And DOJ violated the Free Exercise Clause of the First Amendment to the U.S. Constitution by targeting Safehouse for enforcement to stop its religiously motivated services, despite having never prosecuted any secular entity or individual for a Section 856 violation based solely on "unlawful use," and after publicly announcing a policy of selectively enforcing Section 856(a) on a "district-by-district basis."

The District Court erred by concluding otherwise and dismissing Safehouse's claims for violations of RFRA and the First Amendment under Federal Rule of Civil Procedure 12(b)(6). The District Court's six-page opinion does not address or properly apply the requirements for pleading either type of civil rights violation. Appx4-10. The court concluded that both claims were inadequately pled because Safehouse had failed to plausibly allege that Safehouse is a "religious entity" or that

"its proposed activities would constitute an exercise of religion." Appx5. This conclusion cannot be reconciled with the facts alleged, the governing law, or the Rule 12(b)(6) standard. This Court should reverse and remand for further proceedings.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1345.

The District Court granted DOJ's Rule 12(b)(6) motion to dismiss and issued a final order dismissing this action on April 3, 2024. Appx3. Safehouse and Benitez filed a timely, joint notice of appeal on May 31, 2024. Appx1-2; *see* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred by dismissing Safehouse's claims under RFRA and the First Amendment on the ground that Safehouse—a Pennsylvania nonprofit corporation whose Board members are moved to establish and run Safehouse in accordance with their sincerely held religious beliefs—could not assert such religious beliefs without formal incorporation as a "religious entity"?

<u>Where raised and ruled upon</u>:  Appellants raised this issue in its opposition to DOJ's motion to dismiss (Dist. Ct. Dkt. 215 at 13-46), and the District Court ruled on it in its order of dismissal.  Appx3 (order); Appx4-10 (opinion).

2.     Whether the District Court abused its discretion by denying Safehouse's request for leave to amend?

Where raised and ruled upon:  Appellants raised this issue in its opposition to DOJ's motion to dismiss (Dist. Ct. Dkt. 215 at 46-47), and the District Court dismissed this action and ordered the Clerk of Court to close the case, without addressing the request for leave to amend or explaining the basis for denying that request.  Appx3-10.

## STATEMENT OF RELATED PROCEEDINGS

This is the second time this case has come before this Court.  The first appeal in this matter addressed the DOJ's claim for a declaratory judgment on the scope of 21 U.S.C. 856(a); however, this Court remanded without reaching the RFRA issues presented in this appeal.  *United States v. Safehouse*, 985 F.3d 225, 231, 242 (3d Cir. 2021); *see id.* at 243-53 (Roth, J., dissenting); *see also United States v. Safehouse*, 991 F.3d 503, 506 (3d Cir. 2021) (McKee, J., Restrepo, J., and Roth, J.) (opinion sur denial of petition for rehearing), cert. denied, 142 S. Ct. 345 (2021).

## STATEMENT OF THE CASE

### A.     Formation of Safehouse

Safehouse is a Pennsylvania nonprofit corporation established in 2018 to provide overdose prevention services in Philadelphia.  Appx189 (¶29).  Article IV of Safehouse's Articles of Incorporation states that Safehouse is "organized and

operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, … specifically for the purposes of reducing the harms associated with drug use by providing a range of public health and social services." Appx229.  Since its formation in 2018, Safehouse's mission statement, published prominently on its website, has announced:

> The leaders and organizers of Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious schooling, our devout families and our practices of worship.  At the core of our faith is the principle that preservation of human life overrides any other considerations.

Appx78; *see* Appx100; Appx103 (¶9).  Safehouse's board members share the tenet of religious faith that makes paramount the preservation of human life.  Appx210-214 (¶¶124-32.)

Safehouse plans to open an overdose prevention site that will employ evidence-based public-health interventions, including medically supervised consumption, to mitigate the catastrophic losses associated with the opioid epidemic and overdose crisis in Philadelphia.[1]  Appx190-191 (¶¶32-37); Appx171-174.  In particular, Safehouse "will offer a variety of services" to participants "aimed at

---

[1] In public-health parlance, Safehouse will employ "harm reduction" strategies. Appx190 (¶¶31-32).  Safehouse seeks to minimize harm for individuals who, for whatever reason, may not be ready, willing, or able to pursue full abstinence as a goal. *Id.*; *see* Appx83.

preventing the spread of disease, administering medical care, and encouraging drug users to enter treatment." Appx115.

**B.    Safehouse's Proposed Overdose Prevention Site to Prevent Overdose Deaths and Combat the Opioid Crisis.**

Every second counts when responding to an opioid overdose, particularly given the recent, widespread proliferation of fentanyl—a powerful and fast-acting opioid that is 50-to-100 times more potent than heroin. Appx188 (¶¶21-23). In the event of a fentanyl overdose, a person may stop breathing within minutes of consumption. *Id.* (¶22.) Absent intervention, serious injury or death can occur within only three to five minutes. *Id.* The more time that elapses, the greater the risk of serious injury and death. Appx198 (¶69). Thousands of people in Philadelphia have suffered a fatal overdose since this litigation began. Appx214 (¶132).

Overdose death is preventable. With timely medical intervention, an overdose can be reversed with medical certainty through the administration of Naloxone or similar opioid receptor antagonists and respiratory support. Appx188 (¶23), Appx193 (¶46), Appx197 (¶68). But because a person experiencing an overdose (and thus losing consciousness) cannot self-administer Naloxone, it can only work if trained assistance is close by. Appx198 (¶69.) Ensuring proximity to medical care and Naloxone *at the time of consumption* is therefore a critical component of

efforts to prevent fatal opioid overdose. Appx188 (¶¶22-23), Appx191 (¶34), Appx197-198 (¶¶68-69).

To mitigate this crisis and provide lifesaving care to those most at risk of overdose death, Safehouse sought to establish an overdose prevention site in Philadelphia at which Safehouse staff members will supervise participants' consumption (but will not store or supply any illegal substances). Appx189-191 (¶¶29-38). If necessary, staff will intervene with medical care, including reversal agents to prevent fatal overdose. *Id.*; *see* Appx173 (¶17). Safehouse would also provide sterile medical equipment and ensure its disposal, encourage and provide opportunities for addiction treatment, and offer a range of other behavioral and physical treatments to those in its care.[2]  Appx190-191 (¶¶33-36); Appx171-172 (¶¶7-22.)  Given the urgent need for these services, the staggering number of overdose fatalities in Philadelphia, Safehouse "plans to open at least one facility in Philadelphia as soon as possible." Appx174 (¶24).

### C.   Safehouse's Board and Religious Beliefs

At present, Safehouse exists entirely through its board of directors, which is led by co-appellant José Benitez—Safehouse's Board President. Benitez and other

---

[2] During litigation in the District Court before the first appeal to this Court, the parties stipulated to the core facts describing Safehouse's proposed overdose prevention site. Appx171-174.

board members are adherents of religions in the Judeo-Christian tradition and are

motivated by their religious beliefs:

- Board President Benitez was raised and educated as a Roman Catholic and has spent his entire professional life, including as former Director of Prevention Point Philadelphia, living out that faith and those teachings.

- Board member Dr. Frank A. James III is the past President of Missio Seminary (formerly known as Biblical Theological Seminary), a non-sectarian Protestant graduate and professional institution.

- Board member Reverend Erica Poellot is a Minister of Harm Reduction and Overdose Prevention Ministries of the United Church of Christ.

- Board member Pastor Adarrel Omar Fisher is a Philadelphia Police Chaplain and the pastor of Geiger Memorial Church of the Brethren.

Appx210-211 (¶124).  Although Safehouse is not itself a religious institution or

organization, its board members' beliefs are those of the corporation, and the pursuit

of its mission and conduct of its business will implement those religious beliefs.

Appx211 (¶126).

At the core of the board members' faith is the principle that the preservation

of human life is paramount and overrides other considerations.  *Id.*  They sincerely

believe that human life has inherent value because God created all living things.

Appx213 (¶128).  Based on that principle, Safehouse's board members believe the

provision of overdose prevention services effectuates their religious obligation to

preserve life, provide shelter to our neighbors, and to do everything possible to care

for the sick.  Appx213 (¶129).  These beliefs are rooted in scripture and appear throughout the Old and New Testaments.  Appx211 (¶127).  For example:

- In the Gospel of John, Jesus refused to condemn to death a woman who had sinned, and cautioned fellow believers, "[l]et any one of you who is without sin be the first to cast a stone."  John 8:7-11.

- The Gospel of John also counsels Christians: "The way we came to know love was that [Jesus] laid down his life for us; so we ought to lay down our lives for our brothers.  If someone who has worldly means sees a brother in need and refuses him compassion, how can the love of God remain in him?  Children, let us love not in word or speech but in deed and truth."  1 John 3:16-18.

- Matthew 25:34-40 directs believers to take in and care for the sick: "Then the king [*i.e.*, Jesus Christ] will say to those on his right, 'Come, you who are blessed by my Father.  Inherit the kingdom prepared for you from the foundation of the world.  For I was . . . ill and you cared for me. . . . Amen, I say to you, whatever you did for one of the least brothers of mine, you did for me.'"

- In his Epistle to the Galatians, Paul the Apostle instructs Christians to "[b]ear one another's burdens, and so fulfill the law of Christ." Galatians 6:2.

- According to the Shulchan Aruch, the Code of Jewish Law, "the Torah has granted the physician permission to heal, and it is a religious duty which comes under the rule of saving an endangered life.  If he withholds treatment, he is regarded as one who sheds blood." Shulchan Aruch, Yoreh De'ah 336:1.

- The Book of Leviticus contains the clear commandment:  "You shall not go up and down as a talebearer among your people; neither shall you stand idly by the blood of your neighbor: I am the Lord."  Leviticus 19:16.

- In Deuteronomy, Moses conveys God's commandment:  "You shall open wide your hand to your brother, to the needy and to the poor, in your land."  Deuteronomy 15:11.

- The Talmud teaches: "It was for this reason that man was first created as one person [Adam], to teach you that anyone who destroys a life is considered by Scripture to have destroyed an entire world; and anyone who saves a life is as if he saved an entire world." Mishnah Sanhedrin 4:5.

- Mark 12:28:31, Jesus Christ responds as follows to the question of which "commandment is the most important of all?": "The most important is, 'Hear, O Israel: The Lord our God, the Lord is one. And you shall love the Lord your God with all your heart and with all your soul and with all your mind and with all your strength.' The second is this: 'You shall love your neighbor as yourself.' There is no other commandment greater than these."[3]

Appx211-213 (¶127.i–ix).

These religious beliefs compel and motivate the board members to take action to save lives in the current overdose crisis. Appx213-214 (¶¶129-132). Establishing and running Safehouse in accordance with these tenets is an expression and exercise of their faith. *Id.*

### D. Threatened Prosecution for Violation of the Crack House Statute, 21 U.S.C. § 856(a)

DOJ has asserted—and this Court by a divided vote in the prior appeal affirmed—that the federal "crack house" statute, 21 U.S.C. § 856(a) prohibits Safehouse's overdose-prevention services model. A violation of Section 856(a) is a

---

[3] These are just examples. As courts have recognized, "[T]he concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 544 (D.D.C. 1994) (citing and discussing examples from the Bible, "the five Pillars of Islam," Hinduism, and Judaism).

federal felony that carries with it several criminal and civil penalties, including fines of up to $2 million and imprisonment for up to twenty years.  *See id.* § 856(b), (d).[4]

DOJ has threatened to commence civil and criminal enforcement proceedings to prevent Safehouse from opening and becoming operational.  Appx97-98; Appx186 (¶7).  As a predicate to enforcement proceedings, DOJ brought the underlying declaratory judgment action against Safehouse and Benitez, resulting in Safehouse's counterclaims.  Appx69-76; *see* Dist. Ct. Dkt. 1.  Safehouse, its leaders, board members, and personnel are threatened with federal civil and criminal enforcement unless Safehouse refrains from carrying out its religious beliefs by providing shelter and lifesaving treatment to those at risk of overdose at the time they are most vulnerable—the moment of consumption.  Appx186 (¶8), Appx213-214 (¶¶130-132).

### E.    Burden on Religious Exercise

DOJ's threats of civil and criminal enforcement burden religious exercise by forcing Safehouse to choose between the exercise of its board members' religions and conformity with Section 856.  Appx213-214 (¶130).  Indeed, because of DOJ's threats, Safehouse and its board members have been unable to offer the lifesaving

---

4 In light of this Court's prior ruling, Safehouse accepts for purposes of this appeal that Section 856(a) prohibits Safehouse's contemplated overdose prevention services model.  Safehouse, however, reserves the right to challenge that conclusion in subsequent proceedings in this Court or the U.S. Supreme Court.

overdose prevention services that Safehouse, based on its board members' religious beliefs, seeks to provide. *Id.* (¶131). Contrary to their sincere religious beliefs, Safehouse and its board members have been unable to fulfill their deeply held religious obligation to do everything possible to provide critical lifesaving care, including by providing shelter and medical supervision at the time of consumption to prevent overdose death. *Id.* (¶132).

**F.    DOJ's Policy of Selective Enforcement of Section 856(a)**

Notwithstanding the religious impetus of their project, DOJ has threatened to enforce Section 856(a) against Safehouse and its Board President. But it has not identified "a single § 856(a) case predicated solely on use" of a controlled substance at the penalized location since the statute's inception. Appx151 (n.39). "Instead, it exempts these offenses from prosecution as a matter of course and on an individualized basis. In the 33 years since Section 856 was first enacted, the government has cited no examples of a criminal prosecution under Section 856 involving only simple possession or use—much less prosecutions involving public health interventions similar to Safehouse." Appx 218 (¶145). Nor has it identified a single case in which Section 856(a) was enforced in similar circumstances. DOJ "has never sought to use Section 856 to prosecute or enjoin any public health measure or legitimate medical activity remotely analogous to Safehouse's proposed overdose prevention model." Appx201 (¶81).

Shortly after DOJ moved to dismiss, DOJ announced that it was implementing a policy of selectively enforcing Section 856(a) against providers of supervised consumption services.[5]  Specifically, DOJ declared that "supervised consumption sites were being evaluated on a district-by-district basis, in discussion with local leaders, to determine 'appropriate regulatory guardrails.'"[6]  And throughout these proceedings, DOJ has made exceptions to an unyielding interpretation of Section 856(a) by arguing that the statute permits some forms of supervised consumption, such as supervised consumption in a public space, in a mobile van, or in the home of loving parents who invite their adult child to stay home while suffering from addiction, under their care and watchful eye, "then instruct the child to inject drugs there, in the parents' presence, to allow for resuscitation" with Naloxone.  Appx180; Appx152-153; *see* DOJ Opening Brief at 45 n.11, 54-55 in *United States v. Safehouse*, 3d Cir. No. 20-1422, Dkt. 28.[7]  While contemplating exemptions from

---

[5] Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. Times (Aug. 8, 2023), https://www.nytimes.com /2023/08/08/nyregion/drug-overdoses-supervised-consumption-nyc.html.  Because this policy was announced *after* Safehouse filed its operative pleading, Safehouse could not plead any facts about this policy in its counterclaims.  Safehouse did, however, raise this policy in its opposition to DOJ's motion to dismiss—*i.e.*, its first opportunity to do so.  Dist. Ct. Dkt. 215 at 9-10, 37-38.

[6] Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. Times (Aug. 8, 2023), https://www.nytimes.com /2023/08/08/nyregion/drug-overdoses-supervised-consumption-nyc.html.

[7] DOJ has adopted other exemptions as well.

13

prosecution for similar secular services, DOJ has nevertheless persisted in its effort to enforce Section 856(a) against Safehouse if it provides these same services in accordance with the religious faith of its board.

### G.     DOJ's Initial Complaint, and Safehouse's Initial Counterclaims

On February 5, 2019, DOJ filed a complaint for declaratory judgment against Safehouse and Safehouse's then–Executive Director, seeking a declaration that Safehouse's provision of supervised consumption services would violate 21 U.S.C. § 856(a)(2).  Dist. Ct. Dkt. No. 1.  DOJ subsequently amended its complaint to name Mr. Benitez as a defendant given his role as Safehouse's Board President.  Appx69-Appx76.

As an affirmative defense in their answer to DOJ's action, both Safehouse and Mr. Benitez asserted that the "application of Section 856 to Safehouse is barred by RFRA."  Appx108 (¶3).

---

For instance, since 1970, "there has been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006) (citing 21 C.F.R. § 1307.31); no similar exemption is provided for religious commitments to save life.

The Controlled Substances Act also provides that "[t]he Attorney General, on his own motion or at the request of the Secretary, may authorize the possession, distribution, and dispensing of controlled substances by persons engaged in research. Persons who obtain this authorization shall be exempt from State or Federal prosecution for possession, distribution, and dispensing of controlled substances to the extent authorized by the Attorney General."  21 U.S.C. § 872(e).

14

Safehouse brought a two-count counterclaim against DOJ seeking declaratory and injunctive relief. *See* Dist. Ct. Dkt. 3 (initial answer and counterclaims); Appx184-225 (operative second amended counterclaims). Safehouse's first counterclaim sought a declaratory judgment that, as a matter of statutory interpretation, Section 856(a) does not apply to Safehouse's proposed overdose prevention site. Safehouse's second counterclaim sought a declaration that application of Section 856(a) to Safehouse would violate the Commerce Clause of the U.S. Constitution and that it would violate RFRA by subjecting Safehouse and its founders to criminal penalties for exercising their sincerely held religious beliefs.

## H.    First Round of Proceedings in the District Court

DOJ moved for judgment on the pleadings, and Safehouse opposed the motion. Dist. Ct. Dkt. 47, 48, 115. The District Court denied DOJ's motion and subsequently granted summary judgment in Safehouse's favor, concluding that Section 856(a) does not prohibit Safehouse's proposed conduct because "Safehouse does not plan to make its facility available 'for the purpose of' facilitating unlawful drug use." Appx112-169, Appx175-183. The District Court concluded that "there is no need to reach" the merits of Safehouse's RFRA counterclaim, deemed the counterclaim "preserved," and dismissed it without prejudice. Appx176 (n.1); Appx183 (¶2).

### I.     The Prior Appeal

DOJ appealed.  This Court reversed in a split panel decision, concluding that Safehouse's proposed overdose prevention services model would violate Section 856(a) and that application of that statute to Safehouse would not violate the Commerce Clause of the U.S. Constitution.  *United States v. Safehouse*, 985 F.3d 225 (2021).  This Court remanded to the District Court for further proceedings, including consideration of Safehouse's RFRA counterclaim.  *Id.* at 243.[8]

### J.     Proceedings on Remand

On remand, Safehouse amended its pleadings to: (i) include an additional counterclaim for violations of the Free Exercise Clause of the First Amendment to the U.S. Constitution, and (ii) amend factual allegations reflecting changes to the composition of Safehouse's board.  Appx184-225.

DOJ again moved to dismiss.  Dist. Ct. Dkt. 211.  Safehouse opposed the motion.  Dist. Ct. Dkt. 215.  In the alternative, Safehouse argued that, if the court were to grant DOJ's motion, it should do so without prejudice and with leave to amend.  *Id.* at 46-47.  Following oral argument, the court ordered Safehouse to submit a copy of its IRS Form 1023—*i.e.*, its "Application for Recognition of

---

[8] Safehouse's petition for *en banc* review was denied by a divided Third Circuit, over the dissent of Judge Theodore McKee, joined by Judges L. Felipe Restrepo, and Jane R. Roth (voting for panel rehearing only).  On October 12, 2021, Safehouse's petition for a writ of certiorari to the U.S. Supreme Court was denied. *See* 142 S. Ct. 345 (2021) (No. 21-276).

Exemption under Section 501(c)(3) of the Internal Revenue Code." Appx232 Safehouse complied, filing its Form 1023 on the docket. Appx233-296.

On April 3, 2024, the District Court granted DOJ's motion and dismissed Safehouse's RFRA and First Amendment claims. Appx3 (order); Appx4-10 (opinion). The court did so on the ground that Safehouse failed to plausibly allege that it was a "religious entity" whose "proposed activities would constitute an exercise of religion." Appx5. The court did not address DOJ's other arguments for dismissal or other elements of Safehouse's claims, observing only that "even if Safehouse were a religiously affiliated entity, its counterclaims would face other daunting obstacles," which the court did not identify. Appx9 (n.3). Nor did the court address Safehouse's request for leave to amend. Rather, it ordered the case closed. Appx3.

This timely appeal followed. Appx1-2.

## SUMMARY OF ARGUMENT

The District Court erroneously dismissed Safehouse's RFRA and First Amendment claims for failure to state a claim under Federal Rule of Civil Procedure Rule 12(b)(6). Safehouse's claims were adequately pled, so this Court should reverse and remand.

RFRA's protections extend to any "person" who is engaged in the "exercise of religion." 42 U.S.C. §§ 2000bb–1(a). Congress has defined religious exercise

"expansively to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Nunez v. Wolf*, No. 22-3076, — F.4th —, 2024 WL 3948020, at *3 (3d Cir. Aug. 27, 2024) (quoting 42 U.S.C. § 2000cc–5(7)(A)). "To state a prima facie RFRA claim," Safehouse was required to plausibly allege only "that the government (1) substantially burdened (2) a sincere (3) religious exercise." *Davis v. Wigen*, 82 F.4th 204, 211 (3d Cir. 2023) (quoting *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016)). Safehouse has done so here. It has alleged that in opening an overdose prevention site it is a person engaged in religious exercise under RFRA and the First Amendment. And it has alleged that its religious exercise is substantially burdened by DOJ's threats of prosecution under the "crack house" statute. Nothing more is required to state a plausible claim.

The District Court reached the contrary conclusion by misapplying RFRA and First Amendment precedents and Pennsylvania corporation law. Appx. 5-10. The District Court erred at the outset by applying inapposite Title VII precedents to a RFRA case. Appx7. Proceeding from the flawed premise that the Title VII framework is controlling, the District Court erroneously ruled that Safehouse's claims failed because it had not plausibly alleged that it was a "religious entity." Appx5; *see also* Appx7 (reasoning that Safehouse is not a "religious institution"); Appx9 & n.3 (reasoning that Safehouse is not a "religious enterprise" or a "religiously affiliated entity"). But that is not the relevant inquiry under RFRA. The

question is simply whether Safehouse is a "person" within the meaning of the statute, and the Supreme Court concluded in *Burwell v. Hobby Lobby Stores, Inc.*, that both for-profit and nonprofit corporations are "persons" under RFRA.  573 U.S. 682, 703, 707-708 (2014).  The District Court also erred by concluding—based solely on the absence of an express statement of religious purpose in Safehouse's corporate-formation documents—that Safehouse had not adequately alleged that it intends to engage in protected "religious exercise."  Appx5-9.  But the Supreme Court has rejected that formalistic approach to religious exercise.  *See Hobby Lobby Stores*, 573 U.S. at 707-713.  Moreover, the District Court's conclusion that Safehouse's corporate-formation documents are controlling because a nonprofit corporation has "no traditional owners, and by extension no shareholders" (Appx8) directly conflicts with Pennsylvania law, which confers on a nonprofit corporation's board the authority to govern and act on the corporation's behalf.  *See* 15 Pa. Cons. Stat. § 5721.  Safehouse's board is empowered to establish Safehouse's religious beliefs.  This Court should reject the District Court's reasons for dismissing Safehouse's RFRA claims.

While the District Court did not separately analyze Safehouse's First Amendment claims, those claims were also adequately alleged.  *See Spivack v. City of Phila.*, 109 F.4th 158, 167-179 (3d Cir. 2024).  To plead a free exercise violation, the plaintiff must plausibly allege "that a government entity has burdened his sincere

religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 879-881 (1990)).   At the outset, in the statute's thirty-year history, DOJ has *never* prosecuted any individual under Section 856(a) based the use of property for only simple possession or drug use. DOJ has announced a policy—one that is quintessentially not "generally applicable"—of selective, "district-by-district" exceptions from Section 856 enforcement against supervised consumption services, but it has not allowed Safehouse, an entity asserting religious beliefs and motivation, to proceed. Because DOJ has created an individualized, district-by-district exemption from enforcement, its enforcement policy as applied to Safehouse is subject to strict scrutiny.   DOJ's selective enforcement of Section 856 against Safehouse cannot withstand such scrutiny—especially not at the pleading stage of this case.

Because Safehouse's RFRA and First Amendment claims are at least plausible, this Court should reverse the District Court's Order and remand for discovery and further proceedings.

## ARGUMENT

### I.    Safehouse Has Plausibly Alleged that It Is a "Person" Engaged in the "Exercise of Religion" under RFRA and the First Amendment.

The District Court dismissed Safehouse's RFRA and First Amendment claims based on its determination that Safehouse is not a "religious entity." Appx5.  It did

so after applying the test for a statutory exception to Title VII of the Civil Rights Act granted to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Appx7; 42 U.S.C. § 2000e–1(a). But that is not the correct legal standard under RFRA. Unlike Title VII, RFRA applies to any "***person***" who is engaged in the "***exercise of religion***," irrespective of whether the person is a "religious entity." 42 U.S.C. § 2000bb–1. Elsewhere in its opinion, the court concluded that Safehouse's claims failed because it did not plausibly allege that its "proposed activities would constitute an exercise of religion." Appx5. Although that is, at least, the correct question, that conclusion was also error. Safehouse's proposed operation of an overdose prevention site constitutes an "exercise of religion" within the meaning of RFRA and the First Amendment because its activities will carry out Safehouse's sincere religious beliefs to preserve life and to provide shelter and dignity to vulnerable community members at risk of overdose death. This Court should reverse the District Court's Order and remand so Safehouse can continue to prosecute its claims.

### A.    Standard of Review.

This Court reviews an order dismissing a complaint under Rule 12(b)(6) *de novo*, as a question of law, without affording the district court any deference.

*Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018). In evaluating whether dismissal is proper, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* (quoting *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 242 (3d Cir. 2015)).

### B.    Safehouse Properly Asserts RFRA and First Amendment Claims Based on the Religious Commitments of its Board Members.

RFRA prohibits the "Government [from] substantially burden[ing] a *person's exercise of religion* even if the burden results from a rule of general applicability," unless the "Government . . . demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b) (emphasis added). Because the "compelling interest" and "least restrictive means" issues come into a RFRA case only by way of affirmative defense, the only question at the pleading stage is whether the plaintiff has plausibly alleged a substantial burden on its sincere religious exercise. *Davis*, 82 F.4th at 211. By concluding that Safehouse's RFRA claim failed because Safehouse is not a "religious entity," the District Court ignored and misapplied this plain statutory language permitting any "person" engaged in religious exercise to assert a RFRA claim.

22

In *Burwell v. Hobby Lobby Stores, Inc.*, the Court observed that Congress "included corporations within RFRA's definition of 'persons.' But it is important to keep in mind that the purpose of this fiction is to provide protection for human beings. A corporation is simply a form of organization used by human beings to achieve desired ends." 573 U.S. 682, 706 (2014). Time and again, the Supreme Court has upheld that principle and found that a corporate entity may assert a religious liberty claim under RFRA or the First Amendment based on the commitments of its organizers. *See, e.g.*, *id.* at 701-703, 713-18 (allowing closely held for-profit corporation with more than 13,000 employees to assert a RFRA claim based on the beliefs of the family that "control its board of directors and hold all of its voting shares"); *id.* at 708 (citing cases); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 625-626 (2018) (allowing a for-profit bakery established as a limited company to assert a First Amendment claim based on the religious beliefs of the bakery's owner); *id.* at 662-663 (Thomas, J., concurring). *303 Creative LLC v. Elenis*, 600 U.S. 570, 579, 602-603 (2023) (allowing a for-profit website design limited liability company to assert a First Amendment claim based on the beliefs of its owner); *id.* at 624 (Kagan, J., dissenting).

In *Hobby Lobby*, the Court explicitly rejected the contention that a "corporation cannot engage in the 'exercise of religion' within the meaning of RFRA." 573 U.S. at 713; *see id.* at 714-715 (citing *Gallagher v. Crown Kosher*

*Super Market of Mass., Inc.*, 366 U.S. 617 (1961) (considering Free Exercise claim of kosher market organized as a for-profit corporation)). Rather, the Court reiterated that RFRA protects *all* "persons" from substantial burdens on the "exercise of religion." 42 U.S.C. §§ 2000bb–1(a). As the Court observed in *Hobby Lobby*:

> Under the Dictionary Act, [1 U.S.C. § 1], "the wor[d] 'person' … include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."…
>
> We see nothing in RFRA that suggests a congressional intent to depart from the Dictionary Act definition, and HHS makes little effort to argue otherwise. We have entertained RFRA and free-exercise claims brought by nonprofit corporations, *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (RFRA); *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171 (2012) (Free Exercise); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (Free Exercise), and HHS concedes that a nonprofit corporation can be a "person" within the meaning of RFRA.

573 U.S. at 707-08 (brackets in original). Safehouse is plainly a "person" within the meaning of RFRA.

Nor under *Hobby Lobby* is there any doubt that Safehouse can claim RFRA rights to exercise religion. The *Hobby Lobby* Court rejected the argument that "these corporations are not protected by RFRA because they cannot exercise religion," finding no "persuasive explanation for this conclusion." *Id.* at 709. Examining the language and history of RFRA, the *Hobby Lobby* Court further observed:

If the original text of RFRA was not clear enough on this point—and we think it was—the amendment of RFRA through RLUIPA surely dispels any doubt. That amendment deleted the prior reference to the First Amendment, *see* 42 U.S.C. §2000bb-2(4) (2000 ed.) (incorporating §2000cc-5), …. [and] went further, providing that the exercise of religion "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." §2000cc-3(g).

*Id.* at 714.[9]

In applying that standard, the *Hobby Lobby* Court focused on the sincerity of the corporate owners' religious practices and professed beliefs. 573 U.S. at 703 n.23 (analyzing corporations' "Vision and Values Statement" and "statement of purpose" but not their corporate charters). In so doing, the Court grappled with the federal government's argument that it could be "difficult as a practical matter to ascertain the sincere 'beliefs' of a corporation," but found that the sincerity of the corporation's religious belief is a factual question resolved by reference to the pleadings and then the evidentiary record. *Id.* at 717-19.

Here, as described further below, Safehouse has pleaded that its board members' religious commitments are central to the organization's purpose and operations. Safehouse's counterclaim explains that "at the core of all board members' faith is the principle that the preservation of human life is paramount and

---

[9] "RLUIPA" is the Religious Land Use and Institutionalized Persons Act, which extends RFRA-like protection in certain specified contexts. RLUPIA's expansive definition of the term "exercise of religion" is incorporated into RFRA. 42 U.S.C. § 2000bb–2(4); *id.* § 2000cc–5(7).

overrides any other considerations." App211 (¶126). Safehouse has asserted that this principle, which is rooted in scripture, "obligate[s]" the board members "to establish and run Safehouse in accordance with these tenets." Appx213 (¶129). Safehouse's mission statement announces that its leaders and organizers seek to carry out "Judeo-Christian beliefs ingrained in us from … religious schooling … devout families and our practices of worship." App78; Appx103 (¶9). Safehouse has also alleged that "the pursuit of its mission and conduct of its business will implement those beliefs." Appx211 (¶126). As such, Safehouse has plausibly alleged that its board members' sincerely held religious beliefs are crucial to the organization's anticipated operations, which permits Safehouse to assert these claims on its own behalf as a matter of law. *See*, *infra*, Section I.C. That conclusion is particularly fitting here because, at present, having been prevented so far from opening a facility, Safehouse currently exists entirely through its board.[10]

Given the Supreme Court's interpretation of RFRA's text and requirements, the District Court erred by concluding that Safehouse could not sue under RFRA and the First Amendment on the ground that Safehouse did not satisfy a "series of

---

[10] Safehouse's board members subscribe to different faiths or denominations. But their shared religious beliefs entitle Safehouse to invoke the protections of RFRA. *Hobby Lobby*, 573 U.S. at 717-19 (rejecting the government's argument that closely held corporations cannot hold religious beliefs because of possible disagreement between its owners as to certain religious issues). And Board President Benitez, who is a party to this appeal with a live RFRA affirmative defense to DOJ's declaratory judgment action, seeks to live out his personal Catholic commitments.

criteria," identified in *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 226 (3d Cir. 2007), to determine the applicability of a religious exemption under Title VII.  Appx7.  But *LeBoon* is entirely inapposite.

*LeBoon* construed a provision in Title VII, which exempts certain entities from Title VII's prohibition on discrimination in employment.  42 U.S.C. § 2000e–1(a).  The statute provides that Title VII "shall not apply . . . to *a religious corporation*, *association, educational institution, or society* with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."  *Id.* (emphasis added).  To determine whether an entity was "a religious corporation, association, or society," this Court announced a series of relevant factors.  *LeBoon*, 503 F.3d at 226.  This Court in *LeBoon* did not address the quite different issues of whether an entity is a "person" engaged in "religious exercise|" for purposes of either RFRA or the First Amendment.  The entire function of the *LeBoon* factors is to "determine *whether the corporation's purpose and character are primarily religious.*"  *Id.* (quoting *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988)) (emphasis added).  That is critical under Title VII but is not the relevant inquiry under RFRA.

Led astray by its focus on the inapposite Title VII framework, the District Court incorrectly concluded that Safehouse could not assert RFRA rights without a

statement of religious purpose in its Articles of Incorporation or a provision in its corporate-formation documents describing it as a religious entity. Appx5-9. RFRA does not require a corporation's articles of incorporation or other corporate-formation documents to include an explicit statement of faith or religious values. The issue here is governed by the text, purposes, and history of RFRA, as interpreted by the Court in *Hobby Lobby*—not the quite different language, purpose, and history of an exemption to Title VII. This Court's multi-factor standard for assessing whether an entity can claim exemption from Title VII is simply irrelevant.[11]

The District Court's formalistic approach effaces both the beliefs of the members of the Safehouse board and its official enactments on Safehouse's behalf. Since *Hobby Lobby*, however, governing precedent has examined the beliefs of the owners of the entity in cases involving corporate entities, rather than parsing articles of incorporation. Nothing in *Hobby Lobby*, *Masterpiece Cakeshop*, or *303 Creative* supports such a formalistic approach to the exercise of the broad rights of religious

---

[11] In any event, shortly after its incorporation in 2018, Safehouse did issue a mission statement, displayed prominently on its website, that "[t]he leaders and organizers of Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious schooling, our devout families and our practices of worship. At the core of our faith is the principle that preservation of human life overrides any other considerations." Appx78. For RFRA purposes, there is no meaningful difference between the mission statement issued by Safehouse and the "corporate statement of purpose" issued by the owners of Hobby Lobby Stores or the Vision and Values Statement by the owners of Conestoga Wood, *see Hobby Lobby*, 573 U.S. at 703, 710 n.23.

liberty enshrined in RFRA and the First Amendment.  Rather, the for-profit entities in those cases did not fit into the categories of Title VII–exempt entities—*i.e.*, "a religious corporation, association, or society"—but were still entitled to assert religious liberty claims based on the religious beliefs of the individuals who guided the company.  Even though the Supreme Court has repeatedly "entertained RFRA and free-exercise claims brought by nonprofit corporations," under the District Court's formalistic reasoning, no such corporations—including Catholic hospitals, Muslim haberdasheries, and Jewish summer camps—will ever be able to vindicate their religious rights unless their article of incorporation explicitly states they are incorporated for religious purposes.  As a nonprofit corporation that alleges it seeks to carry out a faith-based mission—and so avows in its mission statement—Safehouse is entitled to seek RFRA's religious protections.

### C.    Safehouse's Board Is Empowered by Pennsylvania Law to Establish the Nonprofit Corporation's Religious Beliefs.

In a further effort to distinguish *Hobby Lobby*, the District Court incorrectly found that nonprofit corporations have *fewer* religious rights than their for-profit counterparts as a matter of Pennsylvania law.  Appx7-9.  This reasoning is flatly inconsistent not only with RFRA's requirements, but also with the laws governing Pennsylvania nonprofit corporations.

The District Court first found that Safehouse lacked the rights of the for-profit corporations in *Hobby Lobby*, *Masterpiece Cakeshop*, and *303 Creative* because a

nonprofit corporation has "no traditional owners, and by extension no shareholders." Appx8 (quoting Peter Molk & D. Daniel Sokol, *The Challenges of Nonprofit Governance*, 62 B.C. L. REV. 1497, 1509 (2021)). This was error. The court's reasoning directly conflicts with Pennsylvania law, which confers on a nonprofit corporation's board the authority to govern and act on its behalf, providing that "the business and affairs of every nonprofit corporation shall be managed by or under the direction of, a board of directors." 15 Pa. Cons. Stat. § 5721. The board thus has the authority to operate for the purpose of religious exercise under Pennsylvania law—regardless of whether board members are treated like "owners" or "shareholders."

Nor does Pennsylvania law constrain a nonprofit board's ability to take action on the nonprofit corporation's behalf in the ways the District Court surmised. Rather, Pennsylvania law expressly provides "a nonprofit corporation shall have the legal capacity of natural persons to act." 15 Pa. Cons. Stat. § 5501. Among these powers of a nonprofit is the authority "[t]o elect or appoint and remove officers, employees and agents of the corporation, [and] define their duties"—as Safehouse has done—and "to exercise all of the powers and means appropriate to effect the purpose or purposes for which the corporation is incorporated." *Id.* § 5502(a)(16), (18). In other words, Safehouse exists and acts through its board—the same board that has stated unequivocally since Safehouse's founding, well before this litigation

began, that Safehouse and its board "are motivated by the Judeo-Christian beliefs … [a]t the core [of which] is the principle that preservation of human life overrides any other considerations." Appx78.

The District Court's reasoning also ignored Safehouse's corporate bylaws, which under Pennsylvania law "may contain any provisions for managing the business and regulating the affairs of the corporation not inconsistent with law or the articles." *Id.* § 5504(a); *see id.* § 5505 (bylaws are binding on members and directors of a nonprofit). Thus, barring any limitation imposed by the bylaws of the nonprofit, the board of directors can determine and articulate the beliefs of the organization so long as those beliefs do not conflict with the nonprofit's purpose. Here, Safehouse's corporate bylaws—a copy of which was filed with its IRS Form 1023 (Appx256-269)—grant the board members full authority to manage Safehouse's "business and affairs" and "all powers to act" on Safehouse's behalf. Appx258 (Art. 3.1). Safehouse's board members therefore are empowered by Pennsylvania law and its own bylaws to exercise their shared religious commitments by providing care for vulnerable people.

The District Court further misinterpreted Pennsylvania law to erroneously conclude that a nonprofit corporation may assert religious rights only if expressly incorporated for a religious purpose at the outset. Pennsylvania requires a new nonprofit corporation to identify one of twenty-seven purposes that include co-

extensive categories such as "athletic," "benevolent," "charitable," "cultural," "educational," "patriotic," "musical," "literary," "mutual improvement," as well as "religious." 19 Pa. Code § 41.4. Nothing in Pennsylvania law provides that Safehouse's initial selection of a general charitable purpose forecloses its subsequent articulation or exercise of religious beliefs.

To the contrary, Pennsylvania law gives nonprofit corporations substantial latitude to take corporate action consistent with its corporate purpose. "[A] nonprofit corporation's action is authorized when: 1) the action is not prohibited by the [Nonprofit Corporation Law] or the corporation's articles; and 2) the action is not clearly unrelated to the corporation's stated purpose." *Zampogna v. L. Enf't Health Benefits, Inc.*, 151 A.3d 1003, 1013 (Pa. 2016). As the Pennsylvania Supreme Court explained, "the interplay between a nonprofit corporation's corporate purpose and that corporation's authority to take corporate action must be construed in the least restrictive way possible, limiting the amount of court interference and second-guessing, which is reflective of both modern for-profit and not-for-profit corporations, and the modern corporate business laws that govern them." *Id.* at 1013.[12]

---

[12] In *Zampogna*, the Pennsylvania Supreme Court explained that "[i]n the early years of our Commonwealth, corporations were required to be incorporated for a specific purpose and were limited to take only those actions that furthered the corporation's purpose. *Id.* at 1011. "However, around the end of the 19th century

It would, in any event, violate federal RFRA protections to force a corporation to make a binary choice between a charitable or religious purpose to maintain its right to assert religious rights. The Court in *Hobby Lobby* found RFRA did not preclude a for-profit corporation from "furthering religious objectives" even where its "central objective is to make money." *Hobby Lobby*, 573 U.S. at 711-712. The Court reasoned that for-profit corporations often choose to "support a wide variety of charitable causes," including "humanitarian and other altruistic objectives," and "[i]f for-profit corporations may pursue such worthy objectives, there is no apparent reason why they may not further religious objectives as well." *Id.* More generally, the Court made clear that RFRA does not require the founders of a corporation to "forfeit all RFRA (and free-exercise) rights" whenever they "choose to incorporate their businesses—without in any way changing the size or nature of their businesses"—because that would require corporate owners to "either give up the right to seek judicial protection of their religious liberty or forgo the benefits, available to their competitors, of operating as corporations." *Id.* at 706. The Supreme Court thus rejected the proposition that a corporation must singularly, or even primarily, pursue a religious purpose to exercise religious beliefs.

---

and the beginning of the 20th century, states began to 'replace the restrictive set-pattern acts of the 1880s with the liberal and flexible 'enabling' corporation statutes that characterized the twentieth century.'" *Id.* (quoting Harwell Wells, *The Modernization of Corporation Law*, 1920-1940, 11 U. PA. J. BUS. L. 573, 585 (2009)).

The District Court similarly misplaced its focus on Safehouse's IRS Form 1023, which states that Safehouse is organized and operated for "charitable purposes" within the meaning of Internal Revenue Code Section 501(c)(3). Appx6; Appx280; *see* Appx235-296 (Form 1023). That focus led to an incorrect assumption that charitable purposes and religious purposes are mutually exclusive concepts under the Internal Revenue Code. But the term "charitable" is a broad umbrella term that encompasses other tax-exempt purposes, including the advancement of religion. Indeed, the corresponding governing and authoritative Treasury regulation provides that "charitable is … not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of charity as developed by judicial decisions," including the "advancement of religion." 26 C.F.R. § 1.501(c)(3)–1(d)(2).[13] As the IRS explains: (i) "an exempt organization may qualify for exemption under more than one purpose and/or activity," and (ii) "[c]haritable purposes and/or activities will, oftentimes, be combined with religious" purposes. *See* IRS Publication 5781, TG 3-3: Exempt Purposes - Charitable IRS Section 501(c)(3), Section I.A(5) at page 5 (Feb. 1, 2024),

---

[13] Similarly, under Pennsylvania state tax exemption law, "charitable purposes" *include*: "The relief of poverty, the advancement and provision of education, including post-secondary education, the advancement of religion, the prevention and treatment of disease or injury, including mental retardation and mental disorders, governmental or municipal purposes, and any other purpose the accomplishment of which is recognized as important and beneficial to the public." 10 Pa. Stat. § 375(b).

https://www.irs.gov/pub/irs-pdf/p5781.pdf. A "charitable purpose[]" therefore is entirely consistent with the exercise of religious beliefs.

In sum, Safehouse has lawfully incorporated as a nonprofit corporation and has sought and obtained Section 501(c)(3) tax-exempt status. Its board members share religious commitments, and Safehouse has announced them as part of the mission of the organization. It is a "person" within the meaning of RFRA that is entitled to the benefits that accompany corporate status *and* to assert religious liberty claims based on the fundamental beliefs of its board members. The District Court erred in concluding otherwise. The only remaining question under RFRA, for Rule 12(b)(6) purposes, is whether Safehouse has plausibly alleged that it is engaged in the "exercise of religion."

### D. Safehouse Has Plausibly Alleged that It Is Engaged in the Exercise of Religion under RFRA and the First Amendment.

To state a RFRA claim, a plaintiff must allege that the conduct at issue is a "sincere exercise of religion." *O Centro*, 546 U.S. at 430-31; 42 U.S.C. § 2000bb–1(a). As set out in the statute, "RFRA protects religious exercise whether or not it is 'compelled by, or central to, a system of religious belief.'" *Davis*, 82 F.4th at 210 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Practices are protected religious exercise where they have "profound religious significance" or are an "expression of [someone's] faith." *Id.* at 212. The Supreme Court has declared that "RFRA was designed to provide very broad protection for religious liberty." *Hobby Lobby*, 573

U.S. at 693, 706.  In fact, RFRA "*must* be 'construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of th[e statute] and the Constitution."  *Davis*, 82 F.4th at 211 (quoting 42 U.S.C. § 2000cc–3(g)).  Indeed, this Court recently reaffirmed and underscored RFRA's "expansive[]" scope.  *Nunez v. Wolf*, No. 22-3076, —F.4th—, 2024 WL 3948020, at *3 (3d Cir. Aug. 27, 2024) (treating an inmate's request to be circumcised and for "ongoing conjugal visits" with his wife as implicating protected religious exercise under the RLUIPA); *see Davis*, 82 F.4th at 211 (explaining that analysis of religious exercise is the same under RLUIPA and RFRA).

The District Court misapplied the law in dismissing Safehouse's claims. Safehouse has sufficiently pled that it is impelled by sincere religious beliefs to provide its lifesaving supervised consumption services.  The calling to provide shelter and lifesaving care to those at acute risk of overdose death carries out the core religious beliefs of its board.  The religious commitments expressed in Safehouse's mission address fundamental and ultimate questions about one's duties to God and are part of religious belief systems dating back millennia.  *Cf. Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981) (distinguishing "religious" from other types of beliefs); Appx211-213 (¶127.i-ix).  The mission statement of Safehouse announces, "The leaders and organizers of Safehouse are motivated by the Judeo-Christian beliefs ingrained in us from our religious schooling, our devout

families and our practices of worship." Appx78; Appx103 (¶9); *see* Appx211 (¶125); *see Hobby Lobby*, 573 U.S. at 703 ("Hobby Lobby's statement of purpose commits the Greens to '[h]onoring the Lord in all [they] do by operating the company in a manner consistent with Biblical principles.'"). Safehouse has further alleged that its Board President, Mr. Benitez, and its board members are devoted followers of religious faiths, Appx210-211 (¶124.i-iv); that the board members share the religious belief—rooted in scriptures and their sacred texts—that they are obligated to "preserve life, provide shelter to [their] neighbors, and to do everything possible to care for the sick," Appx211-213 (¶¶ 126-129); and that the provision of supervised consumption services would effectuate that obligation. Appx213 (¶129). Safehouse board members believe in the existence of God, and in the scripture of their respective faiths. *See* Appx210-213 (¶¶124-129). The positive commandment to save lives animating the Safehouse mission—"the core of all board members' faith," Appx211 (¶126)—derives from the members' sacred texts. Appx211-213 (¶127.i-ix) (listing examples of Jewish and Christian scripture that impose a religious obligation to value and preserve human life).

Preservation of life and provision of shelter for the vulnerable are central religious beliefs for many of the world's faiths. These beliefs are at the very core of the Judeo-Christian traditions of Safehouse's board members. Appx210-213 (¶¶124-127). And the provision of lifesaving medical care and shelter to those at

risk of overdose death is a manifestation of this central religious belief.  Appx213-214 (¶¶129-32).  These beliefs are "religious" within the meaning of RFRA.  They "address[] fundamental and ultimate questions having to do with deep and imponderable matters"—such as the inestimable value of every human life—and are carrying out core tenets of Safehouse board member's Judeo-Christian traditions that elevate preservation of life as a core tenet of their "belief-system as opposed to an isolated teaching."  *Africa*, 662 F.2d at 1032 (discussing First Amendment definition of "religion"); *see also Patrick v. LeFevre*, 745 F.2d 153, 156 (2d Cir. 1984) (emphasizing that judicial expertise is limited to determining "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965) (construing Selective Service statute)).

Safehouse's calling to care for those in need—when those people are most vulnerable—has long been recognized as an integral and central part of religious practice.  Those beliefs are neither novel nor unusual in a way that might suggest a lack of sincerity.  Judeo-Christian religious beliefs have led the faithful to provide aid to the sick and poor for centuries, often by providing shelter to the persecuted or unfortunate, even in the face of governments hostile to religious offers of sanctuary.

Case law has similarly recognized "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions."  *W.*

*Presbyterian Church*, 862 F. Supp. at 544; *see also Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574-575 (2d Cir. 2002) (holding that Christian scripture directing believers "to care for the least, the lost, and the lonely of this world" provided religious basis for conclusion that the provision of sleeping space to the homeless constitutes religious exercise); *Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 729 (9th Cir. 2016) (holding that provision of shelter to the homeless effectuated plaintiff's belief in "Christian compassion towards the oppressed, poor, and hungry"); *Chosen 300 Ministries, Inc. v. City of Phila.*, 12-cv-3159, 2012 WL 3235317, at *17 (E.D. Pa. Aug. 9, 2012) ("Acts of charity are central to Christian worship."; free food distribution in a park). In fact, DOJ has itself recently recognized as much in closely analogous contexts. *See* DOJ Statement of Interest at 8-9, *Micah's Way v. City of Santa Ana*, No. 23-cv-183 (C.D. Cal. May 9, 2023), Dkt. 25 (asserting that providing food and drinks to homeless individuals is a "religious exercise" under RLUIPA—which is substantively identical to RFRA—and citing cases for the proposition that "courts have routinely found that providing charity to homeless individuals … can constitute 'religious exercise' under RLUIPA").

Case law further recognizes that providing shelter and care for vulnerable people can be an exercise of religious faith, even when that care would otherwise violate federal prohibitions. For example, the court in *United States v. Hoffman*

found that RFRA protections applied to members of "No More Deaths," a faith-based humanitarian aid organization dedicated to aiding undocumented immigrants evading border controls, by leaving lifesaving food and water in the Arizona desert. 436 F. Supp. 3d 1272, 1279-89 (D. Ariz. 2020). The organization's members could not be prosecuted where the government failed to demonstrate that prosecution was the least-restrictive means of achieving its environmental interests, even where the defendants "[did] not profess belief in any particular established religion." *Id.* at 1283 (citing *Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989) (construing First Amendment religious exception under unemployment law)). The *Hoffman* court concluded that the defendants were entitled to a religious defense in their criminal case under RFRA. *Id.* at 1289[14]; *see also United States v. Warren*, No. 17-00341, Dkt. 146 (D. Ariz. Nov. 21, 2019) ("Defendant was obliged to leave water jugs because of his religious beliefs, and the Government's regulation imposes a substantial burden on this exercise of his religion."). These cases affirm that religious commitments do not lose their protection when adherents step into the world.

Safehouse's proposed overdose prevention model implements core religious values. Religious commitments compel Safehouse to provide shelter and care to

---

[14] DOJ voluntarily dismissed its appeal. *See United States v. Hoffman*, No. 20-10087, Dkt. 6 (9th Cir. Mar. 13, 2020).

those suffering from addiction in our community in a manner that will prevent overdose deaths—by allowing those at risk of overdose to remain within immediate reach of critical medical care and to benefit from services to alleviate the opioid and overdose crises. Appx193 (¶¶46-47), Appx210-214 (¶¶124-132). Safehouse has thus adequately pled that its proposed operation of a supervised consumption site constitutes an "exercise of religion" within the meaning of RFRA.

The District Court's holding to the contrary was reversible error. The District Court reasoned that "the organizers and leaders of Safehouse profess religious motivation, but the work of Safehouse itself is in no respect religious." Appx8. But the work Safehouse performs need not be sacramental—such as prayer, preaching, or congregating, if that is what the court meant—to be protected by RFRA. The question under RFRA is not whether particular conduct is "religious," but rather whether it represents "any exercise of religion," regardless of "whether or not compelled by, or central to, a system of religious beliefs." 42 U.S.C. §2000bb–2(4) (incorporating *id*. § 2000cc–5(7)(A)). The statute defines religious exercise "expansively" and requires that it be construed "in favor of broad protection of religious exercise" to the "maximum extent" allowed by the Constitution. *Nunez*, 2024 WL 3948020, at *3.

The District Court failed to distinguish Safehouse's practices and immediate goals (*e.g.*, an overdose prevention site and harm reduction strategies) from its

religious beliefs and commitments that are implemented by those practices (*e.g.*, the sanctity of human life, duties of preservation of life, charity, sanctuary, provision of shelter and aid to the needy). Only the latter are relevant to the question of whether Safehouse's efforts are protected expressions of religion. Indeed, this Court's held in *Davis* that marriage that was not a religious command—and can certainly be undertaken for secular reasons—but was an "expression of faith" for that plaintiff and thus constituted the exercise of religion under RFRA. 82 F.4th at 212.

Moreover, in the District Court, DOJ sought to challenge the viability of Safehouse's claims by questioning whether Safehouse's "true motivations" are religious. That is neither an issue under RFRA (except insofar as motive may bear on sincerity) nor a proper inquiry at the pleading stage. The only inquiry is whether Safehouse has pleaded a sincere exercise of religious beliefs. At this stage of the litigation, the Court must credit Safehouse's allegations as true and treat Safehouse's mission as an exercise of its religious convictions. That is confirmed by this Court's decision in *Davis* reversing the pleading-stage dismissal of a civil RFRA claim. 82 F.4th at 210-213. In doing so, this Court rejected both the government's "challenge [to] the sincerity of Plaintiffs' beliefs" and the government's argument "that Plaintiffs did not actually want to marry *for religious reasons*" because those arguments were inconsistent with the pleading standards, which require courts to "accept Plaintiffs' plausible allegations as true and draw all inferences in their

favor." *Id.* at 213 (emphasis added); *see also id.* ("If Defendants wish to challenge Plaintiffs' sincerity, they may do so at a later stage in the proceedings."). *Davis* confirms that many of the bases for dismissal urged by DOJ below are improper because they seek to controvert well-pled facts. *Id.*; *see Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) (explaining that "sincerity and religiosity . . . are factual inquiries").

The sincerity and religious character of Safehouse's professed religious beliefs is not diminished because those beliefs are effectuated by means consonant with sound medical science and in accordance with public-health evidence. DOJ's contrary arguments below—and the implication of the District Court's reasoning—are based on the flawed assumption that if something can be secular, then it cannot also be religious in nature. But this is not the law. To take one classic example, the Supreme Court has held that someone who refuses to work on tank turrets due to his religious faith was entitled to protection for the expression of his religious faith. *See Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 710, 720 (1981). The Court in *Thomas* recognized that religious rights claim even though the plaintiff also might refuse to work on weapons because of political objections. *Id.* Likewise, here the question the Court must decide, based on Safehouse's pleadings, is whether there is a religious motivation underlying Safehouse's efforts. The coincidence with other secular motivations—including ethical, moral, and public-health concerns—does

not deprive Safehouse of its religious claim.   Put differently, Safehouse's commitment to saving lives does not lose its religious nature because it is effectuated through the provision of scientifically sound medical care (otherwise, for example, the extensive network of Catholic hospitals would have no religious rights), because it is based on evidence that such measures would improve public health, or because it coincides with political or social views about the appropriate way to combat the opioid epidemic.  *See Welsh v. United States*, 398 U.S. 333, 342 (1970) (a person's beliefs may be religious even if they also contain a "substantial political dimension").

Safehouse effectuates its religious commitments by employing evidence-based medical and public-health measures.  Courts have never required the faithful to ignore the world around them.  Faith-based action certainly may be informed by social, medical, and economic evidence.  *See, e.g.*, *W. Presbyterian Church*, 862 F. Supp. at 546 (feeding program was "[u]nquestionably … in every respect [a] religious activity and form of worship" even though "[i]t also happen[ed] to provide, at no cost to the city, a sorely needed social service").

<p align="center">*      *      *      *      *</p>

Because the District Court erred in dismissing Safehouse claims for failure to plead that it is a "religious entity" engaged in "religious exercise," without addressing whether Safehouse's pleading satisfied the other elements of a *prima*

<p align="center">44</p>

*facie* RFRA or First Amendment claim, this Court should vacate the District Court's order and remand.

## II.    Safehouse's Religious Exercise Is Substantially Burdened by the Government's Threatened Prosecution.

The threat to enforce Section 856(a) against Safehouse substantially burdens Safehouse's religious exercise.  Although the District Court did not rule on this point, Safehouse met its burden to plead this element of a RFRA claim as well.  A substantial burden exists where, as here, the plaintiff is subjected to "serious disciplinary action" for exercising their sincere religious beliefs. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015); *see Davis*, 82 F.4th at 212 (holding that a "substantial burden" exists where "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs").  "[T]he inquiry here isn't into the merit of the plaintiff's religious beliefs or the relative importance of the religious exercise … . Instead, the inquiry focuses only on the coercive impact of the government's actions." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.).

The threat of criminal sanctions for exercising a religious belief constitutes a substantial burden. *See Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) (effect of law mandating conduct at odds with Amish beliefs, "under threat of criminal sanction," was "not only severe, but inescapable"); *O Centro*, 546 U.S. at 426 (government conceded that prosecution under the Controlled Substances Act would constitute a

substantial burden). Indeed, "[t]here can hardly be a more substantial burden on a religious practice or exercise than its outright prohibition." *Davis*, 82 F.4th at 212; *see also Hobby Lobby*, 573 U.S. at 719-20, 726 (concluding with "little trouble' that a potential $800,000 fine substantially burdened the plaintiff corporation's religious exercise); *Yoder*, 406 U.S. at 208, 218 (holding that a $5 fine for violating compulsory school attendance laws was a "grave interference" with defendants' religious tenets).

DOJ's present actions squarely fit the definition of "substantial burden." In response to Safehouse's announcement that it was planning to open an overdose prevention shelter, the U.S. Attorney's Office threatened criminal and civil sanctions for a purported Section 856(a) violation, and commenced this lawsuit. Appx191 (¶39); Appx97-98. Successful prosecution of Safehouse under Section 856(a) carries fines of up to $2,000,000, potential imprisonment of individual defendants, plus a risk of property forfeiture. *See* 21 U.S.C. § 856(b). The threat of prosecution under Section 856(a) thus places substantial pressure on Safehouse's officers either to refrain from providing supervised consumption services or face "serious disciplinary action" for exercising their religious beliefs. *Hobbs*, 574 U.S. at 361. There should be no dispute as to substantial burden.

In short, Safehouse has adequately alleged that enforcing Section 856(a) against it would substantially burden Safehouse's religious exercise, thus establishing a RFRA claim.

## III.    Safehouse Has Asserted a Viable First Amendment Claim.

The District Court did not separately analyze Safehouse's First Amendment claim, dismissing it for the same reasons it dismissed the RFRA claim.  But under recent Supreme Court cases, the two analyses (statutory and constitutional) are not the same.  This Court should accordingly remand so the District Court can consider that claim in the first instance, with the benefit of this Court's post-dismissal decision in *Spivack v. City of Philadelphia*, which lays out and applies the applicable framework for assessing alleged violations of the Free Exercise Clause of the First Amendment.  109 F.4th 158, 167-179 (3d Cir. 2024).  But if this Court is inclined to address the merits of that claim, it should readily conclude that Safehouse plausibly pleaded a First Amendment violation.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law … prohibiting the free exercise" of religion. To plead a free exercise violation, the plaintiff must plausibly allege "that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525 (quoting *Smith*, 494 U.S. at 879-881).  A law or policy lacks general applicability "if it prohibits religious conduct

while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021); *see Clark v. Gov. of N.J.*, 53 F.4th 769, 780 (3d Cir. 2022) (holding that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)); *see Kennedy*, 597 U.S. at 526 (same). A governmental policy also is not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (internal quotation marks omitted). If the plaintiff satisfies this pleading burden, then courts will "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)). This is "the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546.

As already discussed, DOJ has burdened Safehouse's religious exercise, *see, ante*, Section II. And Safehouse has plausibly alleged that DOJ is enforcing Section 856(a) against Safehouse pursuant to a policy that is not "generally applicable."

*First*, strict scrutiny applies because DOJ has implemented a policy of enforcing Section 856(a) in a manner that treats "comparable secular activity more favorably than religious exercise." *Clark*, 53 F.4th at 780 (quoting *Tandon*, 593 U.S. at 62). DOJ has never prosecuted under Section 856(a) based on only simple possession or use of controlled substances on a defendant's property, as it would by targeting Safehouse's religiously motivated overdose prevention services. Despite threatening to enforce Section 856(a) against Safehouse and its religiously motivated Board President, the government has not identified "a single § 856(a) case predicated solely on use" at the penalized location since the statute's inception. Appx151 (n.39). Nor has it identified a single case in which Section 856(a) was enforced in similar circumstances. Appx201 (¶81), Appx 218 (¶145). Rather, in the decades since Section 856 was first enacted, and more than five years of litigation with Safehouse, DOJ has cited no example of a criminal prosecution under Section 856 involving only simple possession or use, rather than distribution or manufacture of a controlled substance—much less prosecutions involving public-health interventions similar to Safehouse.[15]

---

[15] DOJ cannot claim that it generally prosecutes Section 856 where controlled substances are simply possessed or used, but not stored, distributed, or manufactured, at the penalized location; instead, it exempts these offenses from prosecution as a matter of course and on an individualized basis.

*Second*, DOJ has announced a policy—one that is quintessentially not "generally applicable"—of selective, "district-by-district" authorization of section 856 against supervised consumption services, but it has not allowed Safehouse to proceed. Section 856(a) is not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (internal quotation marks omitted). Although DOJ argues that no such mechanism exists, that is incorrect: after moving to dismiss, DOJ announced to news organizations that it was implementing a policy of selectively enforcing Section 856(a) against providers of supervised consumption services on a "district-by-district" basis.[16] Where the government creates exemptions from a law for those engaged in non-religious activity, as here, it "may not refuse to extend that [exemption] system to cases of 'religious hardship' without compelling reason." *Fulton*, 593 U.S. at 535 (quoting *Smith*, 494 U.S. at 884). Because DOJ has created an individualized, district-by-district exemption from enforcement, its enforcement policy as applied to Safehouse is subject to strict scrutiny. *Id.*; *see also Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (holding that, under *Fulton*, "where a state

---

[16] Sharon Otterman, *Federal Officials May Shut Down Overdose Prevention Centers in Manhattan*, N.Y. Times (Aug. 8, 2023), https://www.nytimes.com/2023/08/08/nyregion/drug-overdoses-supervised-consumption-nyc.html. It appears that the basis for exercising this discretion may be the socio-political views of the local municipal administration, although DOJ has not admitted this.

extends discretionary exemptions to a policy, it must grant exemptions for cases of 'religious hardship' or present compelling reasons not to do so").

DOJ cannot invoke prosecutorial discretion to justify its unequal and unconstitutional application of the law. While DOJ "retains 'broad discretion' to enforce the Nation's criminal laws," that discretion is "subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States,* 470 U.S. 598, 607 (1985), and *United States v. Batchelder,* 442 U.S. 114, 125 (1979)). For instance, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, *religion*, or other arbitrary classification.'" *Id.* (emphasis added) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Such prohibited discrimination encompasses not only treating one religious belief better than another, but also treating secular activities "more favorably than religious exercise." *Tandon*, 593 U.S. at 62; *Clark*, 53 F.4th at 780. As Safehouse has alleged, DOJ's policy of selectively enforcing Section 856(a) against Safehouse—but not secular providers of the same services—does precisely that. While DOJ emphasized in the District Court the supposed absence of "evidence … that the United States has in any way unconstitutionally targeted religion in exercising its prosecutorial discretion in Controlled Substances Act matters" (Dist. Ct. Dkt. 211 at 39), that argument ignores its selective enforcement of Section 856(a)

and overlooks that the reasons for DOJ's enforcement policy is a fact issue not susceptible to resolution at the pleading stage.

That conclusion is confirmed by this Court's recent decision in *Spivack* reversing the grant of summary judgment on Free Exercise Claims because factual disputes over whether a government policy was "generally applicable" precluded resolution as a matter of law. 109 F.4th at 171-179. That is, in part, because the policy at issue—one requiring employees in the District Attorney's Office to be vaccinated—"allowed for discretionary exemptions" made "on a case-by-case basis considering various factors and based on an individual assessment of each situation" but "with no apparent guidelines or guardrails." *Id.* at 171-172 & n.8. If that exemption in *Spivack* could not be declared "generally applicable" for purposes of summary judgment, then at the pleading stage this Court should not accept DOJ's argument here that its policy of granting "case-by-case" exemptions to non–religiously motivated supervised consumption sites in other jurisdictions, while threatening prosecution of Safehouse for the same religiously motivated conduct, is generally applicable.

Because DOJ's enforcement policy is not "generally applicable," it is subject to strict scrutiny. *Kennedy*, 597 U.S. at 525. That means Safehouse has stated a plausible First Amendment violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and

52

was narrowly tailored in pursuit of that interest." *Id*. (quoting *Lukumi*, 508 U.S. at 546). This is DOJ's burden, not Safehouse's, and that burden certainly cannot be satisfied at the pleading stage. DOJ did not even attempt to satisfy this standard in the District Court—and it could not do so without a trial. As a result, regardless of its ruling under RFRA, this Court should reverse and remand for discovery and trial on the Safehouse's First Amendment claim.

## IV.    The District Court Erred by Denying Leave to Amend.

Under Civil Rule 15(a)(2), "[l]eave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006). This "liberal amendment philosophy" weighs heavily in favor of allowing Safehouse to amend its RFRA and First Amendment counterclaims if this Court is inclined to uphold the dismissal of Safehouse's claims as initially pleaded (which it should not). *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984).

In dismissing Safehouse's counterclaims, the District Court did not even address the request for leave to amend—much less explain the basis for that denial. As this Court has explained, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1434 (3d Cir.

1997) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  That principle further justifies reversal and remand here.

If the Court were to agree with the District Court's ruling on the merits, Safehouse should accordingly be afforded the opportunity to amend to address and cure any defects this Court identifies in its pleading, including by pleading additional allegations supporting its and its board members religious beliefs, the "religious" exercise or character of Safehouse's proposed activities project under the relevant factors, DOJ's selective enforcement policy regarding supervised consumption (which were unavailable to Safehouse until after DOJ moved to dismiss), and the burdens that policy imposes on Safehouse's religious exercise.

## CONCLUSION

This Court should reverse the District Court's order and remand for further proceedings.

September 4, 2024                    Respectfully submitted,

**DLA PIPER LLP (US)**

By:  */s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
Ben C. Fabens-Lassen
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103-7300
Tel:    215.656.3300

**AIDS LAW PROJECT OF
PENNSYLVANIA**

Ronda B. Goldfein
Adrian M. Lowe
1211 Chestnut Street, Suite 600
Philadelphia, Pennsylvania 19107
Tel:    215.587.9377

**LAW OFFICE OF PETER
GOLDBERGER**
Peter Goldberger
P.O. Box 645
Ardmore, Pennsylvania 19003
Tel:    610.649.8200

**SETH F. KREIMER, ESQUIRE**
Seth F. Kreimer (PA Bar No. 26102)
3501 Sansom Street
Philadelphia, Pennsylvania 19104
Tel:    215.898.7447

*Attorneys for Appellants Safehouse and
José Benitez*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I hereby certify that I, Ilana

H. Eisenstein, am admitted as an attorney and member in good standing of the bar

of the United States Court of Appeals for the Third Circuit.

September 4, 2024                    By:  */s/  Ilana H. Eisenstein*

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), Fed R. App. P. 28(a)(10), and Local R. 31.1, I certify the following:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,764 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font using Microsoft Word 2016.

3.     This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies and because Windows Defender Antivirus was run on the file containing the electronic version of this brief and no viruses were detected.

September 4, 2024                    By:  */s/  Ilana H. Eisenstein*

# JOINT APPENDIX
# TABLE OF CONTENTS

**Page No.**

## VOLUME I (BOUND WITH BRIEF)

Notice of Appeal, Dkt. 238 (May 31, 2024) ....................................................Appx1

Order Dismissing Action, Dkt. 237 (April 3, 2024) .......................................Appx3

Opinion, Dkt. 236 (April 3, 2024) ................................................................Appx4

## VOLUME II

Docket Sheet, E.D. Pa. No. 19-cv-519 ..........................................................Appx11

DOJ's Amended Complaint, Dkt. 35 (May 28, 2019)....................................Appx69

Exhibits to DOJ'S Amended Complaint, Dkt. 35-1 (May 28, 2019) .............Appx77

Safehouse's Answer and Affirmative Defenses to DOJ's
    Amended Complaint, Dkt. 45 (June 7, 2019) .......................................Appx102

Opinion on DOJ Motion for Judgment on Pleadings,
    Dkt. 133 (Oct. 2, 2019) .......................................................................Appx112

Order on DOJ Motion for Judgment on Pleadings,
    Dkt. 134 (Oct. 2, 2019) .......................................................................Appx168

Parties' Stipulation of Facts, Dkt. 137-1 (Jan. 17, 2020) ............................Appx171

Opinion on Cross-Motions for Summary Judgment,
    Dkt. 141 (Feb. 25, 2020) .....................................................................Appx175

Order on Cross-Motions for Summary Judgment,
    Dkt. 142 (Feb. 25, 2020) .....................................................................Appx182

Safehouse's Second Amended Counterclaims,
    Dkt. 209 (June 27, 2023)......................................................................Appx184

Safehouse's Articles of Incorporation, dated August 9, 2018,
    Dkt. 211-1 (July 21, 2023) ..................................................................Appx227

Order regarding Safehouse's Form 1023, Dkt. 234 (Mar. 25, 2024) ..........Appx232

Letter to Court with Safehouse's Form 1023 and Corporate Bylaws,
    Dkt. 235 (Mar. 29, 2024) ....................................................................Appx233

i

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAFEHOUSE, a Pennsylvania nonprofit corporation, | |
|         Counterclaim Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, | |
|         Counterclaim Defendant, | |
| U.S. DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; JACQUELINE C. ROMERO, in her official capacity as U.S. Attorney for the Eastern District of Pennsylvania, | |
|         Third-Party Defendants. | |
| | |
| UNITED STATES OF AMERICA, | |
|         Plaintiff, | |
| v. | Civil Action No.: 2:19-cv-00519 |
| SAFEHOUSE, a Pennsylvania nonprofit corporation; JOSÉ BENITEZ, as President and Treasurer of Safehouse, | (Honorable Gerald A. McHugh) |
|         Defendants. | |

## <u>NOTICE OF APPEAL</u>

Defendant and Counterclaim Plaintiff Safehouse and Defendant José Benitez appeal to the United States Court of Appeals for the Third Circuit from this Court's Order (ECF No. 237), entered on April 3, 2024, which is the final order in this case.

May 31, 2024                       Respectfully submitted,

**DLA PIPER LLP (US**

By:  */s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
ilana.eisenstein@dlapiper.com
Ben C. Fabens-Lassen
ben.fabens-lassen@dlapiper.com
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103-7300
Tel:    215.656.3300

**AIDS LAW PROJECT OF
PENNSYLVANIA**

Ronda B. Goldfein
goldfein@aidslawpa.org
Yolanda French Lollis
lollis@aidslawpa.org
Adrian M. Lowe
alowe@aidslawpa.org
Jacob M. Eden
eden@aidslawpa.org
1211 Chestnut Street, Suite 600
Philadelphia, Pennsylvania 19107
Tel:    215.587.9377

**LAW OFFICE OF PETER
GOLDBERGER**

Peter Goldberger
 P.O. Box 645
Ardmore, Pennsylvania 19003
Tel:    610.649.8200
*peter.goldberger@verizon.net*

**SETH F. KREIMER, ESQUIRE**

Seth F. Kreimer
3501 Sansom Street
Philadelphia, Pennsylvania 19104
Tel:    215.898.7447
*skreimer@law.upenn.edu*

*Attorneys for Safehouse*

Appx2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
|        **Plaintiff,** | : | |
| | : | |
|       **v.** | : | |
| | : | |
| **SAFEHOUSE, a Pennsylvania nonprofit** | : | |
| **corporation; JOSE BENITEZ, as President** | : | |
| **and Treasurer of Safehouse,** | : | **CIVIL ACTION** |
|       **Defendants,** | : | **No. 19-519** |
| | : | |
| | : | |
| **SAFEHOUSE, a Pennsylvania nonprofit** | : | |
| **corporation,** | : | |
|       **Counterclaim Plaintiff,** | : | |
| | : | |
|       **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
|       **Counterclaim Defendant.** | : | |

## <u>ORDER</u>

This 3rd day of April, 2024, it is hereby **ORDERED** that, for the reasons in the accompanying memorandum, Counterclaim Defendant United States of America's Motion to Dismiss (ECF 211) is **GRANTED** and this action is hereby **DISMISSED.** The Clerk of Court is requested to mark this case closed.

                                    <u>/s/ Gerald Austin McHugh</u>
                                    United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | : <br> : <br> : | |
| v. | : <br> : | |
| SAFEHOUSE, a Pennsylvania nonprofit<br>corporation; JOSE BENITEZ, as President<br>and Treasurer of Safehouse,<br>Defendants, | : <br> : <br> : <br> : <br> : | CIVIL ACTION<br>No. 19-519 |
| SAFEHOUSE, a Pennsylvania nonprofit<br>corporation,<br>Counterclaim Plaintiff, | : <br> : <br> : <br> : | |
| v. | : <br> : | |
| UNITED STATES OF AMERICA,<br>Counterclaim Defendant. | : <br> : | |

**McHUGH, J.**                                                                          **April 3, 2024**

### MEMORANDUM

This is a declaratory judgment action in which the federal government sought and ultimately won a ruling from the Third Circuit Court of Appeals that it could criminally prosecute Safehouse, a non-profit organization, under 18 U.S.C. § 856 if Safehouse proceeded with its plans to open a safe injection site for persons struggling with opioid abuse. Safehouse's response included two counterclaims, alleging a violation of the Religious Freedom Restoration Act, and a violation of its First Amendment right to free exercise of religion. Safehouse contends that its work is inspired and informed by classic Judeo-Christian beliefs about the need to "preserve life, provide shelter to our neighbors, and do everything possible to care for the sick," and that the threat of prosecution chills its exercise of religious rights. Second Am. Countercl. ¶ 129 (ECF 209).

Appx4

After the Court of Appeals established the Government's right to prosecute, I granted the parties a lengthy stay of proceedings to explore whether they could find common ground. Despite their good faith efforts, negotiation has not produced an agreement to allow Safehouse to operate as intended. Consequently, I must address the Government's motion to dismiss the counterclaims. Because I am persuaded that Safehouse is not a religious entity, I will grant the motion to dismiss.

## I. Standard of Review

Within the Third Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## II. Discussion

Safehouse asserts two counterclaims. First, it relies on the Religious Freedom Restoration Act (RFRA), which provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a). Second, it invokes the Free Exercise Clause of the First Amendment, arguing the threat of prosecution has burdened its "sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). But a threshold for both claims is that Safehouse establish its proposed activities would constitute an exercise of religion, and it cannot plausibly do so.

Safehouse's Articles of Incorporation do not set forth any religious mission or activity. (ECF 211-1). Article IV provides that "[t]he Corporation is a nonprofit organization organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 . . . specifically for the purposes of reducing the harms associated with drug use by providing a range of public health and social services." *Id*. Safehouse also

Appx5

maintains a website that includes a section for "Frequently Asked Questions." (ECF 35-1). In response to the question "What is Safehouse?" there is an explicit reference to the underlying religious motivation of its founders and leaders, but the description of its activities does not set forth any apparent religious practices or behavior. Instead, the website describes Safehouse as a provider of public health services. Specifically, it states:

> Safehouse is one element of a much-needed comprehensive plan to address a public health crisis. The organization seeks to open the first safe injection site in the U.S. providing a range of overdose preventions services, including safe consumption and observation rooms staffed by a medical staff prepared to administer overdose reversal if needed. Additional services would include on-site initiation of Medically Assisted Treatment (MAT), recovery counseling, education about substance use treatment, basic medical services, and referrals to support services such as housing, public benefits, and legal services.

(ECF 35-1 at 2-3). Nor does Safehouse's Form 1023 applying for tax-exempt status from the Internal Revenue Service set forth any religious activity or purpose and makes no reference to religion. (ECF 235)

This distinguishes Safehouse from other organizations that have successfully claimed the protections conferred by RFRA. In *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006), for example, the plaintiff was a religious sect with origins in the Amazon rainforest, which sought to use tea brewed from a hallucinogenic substance as part of sacramental practice.[1] Similarly, the plaintiff that prevailed in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), was a church in the Santeria religion, which employs animal sacrifice as a form of devotion. The ritualistic practices at issue in these cases all fit well within the Third Circuit's "guideposts" for identifying a religion:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it

---

[1] The facts in *O Centro Espírita* closely track the facts in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990), the case that inspired RFRA, where the Court previously upheld a ban on the use of peyote as part of religious practice.

consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981).

RFRA defines "exercise" but, understandably, does not attempt to define "religion." In applying Title VII, which exempts religious organizations, once again without attempting to define religion, the Third Circuit has endorsed a series of criteria for courts to consider in determining whether an entity is engaged in religious activity, including:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,* 503 F.3d 217, 226 (3d Cir. 2007).[2]

Applying that test, the Court in *LeBoon* concluded that a Jewish community center was religious in nature where its articles of incorporation and bylaws stated that its mission was to enhance and promote Jewish life, identity, and continuity; three rabbis from local synagogues played an advisory role in the center's management; synagogues and local Jewish organizations gave the center financial support; the center kept a kosher kitchen; and it hosted Jewish events and observed holy Jewish holidays. *Id.* at 227-29. In comparison, aside from its non-profit status, Safehouse does not embody any of the other characteristics of a religious institution recognized in *LeBoon.*

---

[2] Safehouse summarily argues that a case defining religious activity for Title VII purposes has no applicability here but offers no rationale for that argument.

4

Significantly, a non-profit corporation organized under Pennsylvania law has no individual owners. The statutory provision which addresses "ownership of assets" requires the non-profit corporation to designate the trusts and funds it controls as assets, and those assets "shall not be deemed to have individual ownership." 15 Pa. C.S.A. § 5589. As observed by two commentators on non-profit governance when comparing the differences between non-profit and for-profit corporations, "[n]onprofits, however, have no traditional owners, and by extension no shareholders." Peter Molk & D. Daniel Sokol, *The Challenges of Nonprofit Governance*, 62 B.C. L. Rev. 1497, 1509 (2021). Consequently, the actions of a non-profit are governed by its stated purpose, not the preferences of individual owners. Here, the organizers and leaders of Safehouse profess religious motivation, but the work of Safehouse itself is in no respect religious.

Safehouse is correct that corporations can be considered "persons" acting with a religious purpose, but the case on which it relies, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), involved closely held corporations controlled by families who explicitly embraced religious values and practices in the operation of the business. In the case of Hobby Lobby and its affiliated company, Mardel, the corporate statement of purpose required "operating the company in a manner consistent with Biblical principles." *Id*. at 703. Both companies closed on Sundays despite the expectation that millions of dollars in sales would be lost. *Id.* Each family member signed a pledge to run the businesses in accordance with the family's religious beliefs and to use the family's assets to support Christian ministries. *Id.* The businesses also contributed profits to Christian missionaries and ministries and bought hundreds of full-page newspaper ads inviting people to the Christian faith. *Id.* As far as Conestoga Wood Specialties, the other business considered in *Hobby Lobby*, the Supreme Court found that "[t]he company's 'Vision and Values Statements' affirms that Conestoga endeavors to ensure a reasonable profit in a manner that reflects the [owners']

Christian heritage," and its owners defined the company's mission as requiring it "to operate in a professional environment founded upon the highest ethical, moral, and Christian principles." *Id.* at 701. In contrast, Safehouse has no "owners," and its purpose is necessarily defined by its articles of incorporation, which set forth no religious purpose.

When the decision was issued, *Hobby Lobby* seemed to embrace an extraordinarily expansive definition of "religious" activity. Even so, the Court, in its opinion, surmised that there would likely be few corporations that could claim to be organized for an explicit religious purpose. *Id.* at 717. In fact, in the ten years since *Hobby Lobby* was decided, there is a dearth of precedent applying – let alone extending – its core holding, and certainly no case that would support deeming Safehouse a religious enterprise.

As an entity unaffiliated with any specific faith or religious institution, Safehouse claims protection for its non-religious *actions,* based solely upon the religious *motivation* of its founders. Neither RFRA nor the free exercise clause extends that far, as religion cannot provide a "limitless excuse for avoiding all unwanted obligations." *Africa*, 662 F.2d at 1030 (citation omitted). That is necessarily so, because "'the very concept of ordered liberty precludes allowing' [a plaintiff], or any other person, a blanket privilege 'to make his own standards on matters of conduct in which society as a whole has important interests.'" *Id.* at 1031 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).[3] The noble intentions of Safehouse and its founders are self-evident, and the public health crisis they seek to address continues unabated, but their religious inspiration does not provide a shield against prosecution for violation of a federal criminal statute barring its operation.

---

[3] It should be noted that even if Safehouse were a religiously affiliated entity, its counterclaims would face other daunting obstacles.

### III.   Conclusion

For the reasons set forth above, the Government's motion to dismiss Safehouse's counterclaims must be granted, and this case will be dismissed.

<div style="text-align: right">

 /s/ Gerald Austin McHugh
United States District Judge

</div>