**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2027
_____

UNITED STATES OF AMERICA

v.

SAFEHOUSE, a Pennsylvania Nonprofit Corporation;
JOSE BENITEZ, as President and Treasurer of Safehouse,
Appellants

_____

SAFEHOUSE, a Pennsylvania nonprofit corporation
Appellant

v.

U.S. DEPARTMENT OF JUSTICE; MERRICK B.
GARLAND, in his official capacity as Attorney General of
the United States; and JACQUELINE C. ROMERO, in her
official capacity as U.S. Attorney for the Eastern District of
Pennsylvania

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:19-cv-00519)

District Judges: Honorable Gerald A. McHugh

_____

Argued on April 9, 2025
Before: HARDIMAN, PORTER, and FISHER, *Circuit Judges*.

(Filed: July 24, 2025)
_____

OPINION OF THE COURT
_____

Ronda B. Goldfein
Adrian M. Lowe
AIDS Law Project of Pennsylvania
1211 Chestnut Street
Suite 600
Philadelphia, PA 19107

Ilana H. Eisenstein [**ARGUED**]
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Ben C. Fabens-Lassen
DLA Piper
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067

Peter Goldberger

Law Office of Peter Goldberger
P.O. Box 645
Ardmore, PA 19003

Seth F. Kreimer
University of Pennsylvania
School of Law
3400 Chestnut Street
Philadelphia, PA 19104
    *Counsel for Appellants*

Sarah W. Carroll
United States Department of Justice
Civil Division Appellate
Room 7511
950 Pennsylvania Avenue NW
Washington, DC 20530

Lowell V. Sturgill, Jr. [**ARGUED**]
United States Department of Justice
Civil Division
Room 7241
950 Pennsylvania Avenue NW
Washington, DC 20530
    *Counsel for Appellees*

Devin S. Sikes
Akin Gump Strauss Hauer & Feld
2001 K Street NW
Washington, DC 20006
    *Counsel for Amicus Faith Leaders*

PORTER, *Circuit Judge*.

Safehouse, a Pennsylvania nonprofit corporation, was established in 2018 to address the abuse of opioids in Philadelphia. It seeks to provide overdose prevention services, including supervised illegal drug use. According to Safehouse, what it calls "medically supervised consumption" is salutary because opioid overdoses can be mitigated if trained staff are nearby.

This is the second time we have considered the legality of Safehouse's proposed activities. We previously determined that, as a provider of supervised illegal drug use, Safehouse would violate 21 U.S.C. § 856(a)(2). Safehouse argues that its Board members' shared religious belief in the value of human life motivates it to provide "evidence-based public-health interventions" and that government intervention with those services substantially burdens its religious exercise.

The District Court rejected Safehouse's argument. It reasoned that non-religious entities are not protected by the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment. As we explain below, that was reversible error.

I

An opioid overdose can occur minutes after drug use. And tragically, it too often does. The Pennsylvania Department of Health estimates that last year 702 opioid overdose deaths occurred in Philadelphia County.[1] Fentanyl—a synthetic

---

[1] Drug Overdose Surveillance Interactive Data Reports, Pennsylvania Department of Health Office of Drug

opioid 50-to-100 times more potent than heroin and often laced into more popular drugs—has further exacerbated the opioid problem.

Safehouse urges several "harm reduction strategies." App. at 190. Harm reduction is a term of art for interventions that focus on mitigating the bad effects of harmful behavior rather than stopping the harmful behavior itself. Providing drug users sterile syringes is a classic example and one of the services that Safehouse proposes. Safehouse's other harm-reduction strategies include offering to test drugs for fentanyl and inviting drug users to take illegal drugs in a specially designated "consumption room" under its supervision. App. at 192.

According to Safehouse, supervised drug use is appropriate because it means that staff can be ready to reverse an overdose by administering Naloxone. Naloxone is easy to administer as a nasal spray, but one who is overdosing cannot reliably self-administer. And sometimes, multiple doses of Naloxone, intramuscular injections of Naloxone, or oxygen and respiratory support are required. Safehouse would not provide any illegal drugs or allow drugs to be sold or

---

Surveillance and Misuse Prevention, https://www.pa.gov/agencies/health/healthcare-and-public-health-professionals/pdmp/data.html (click "Drug Overdose Surveillance"; then go to the tab labelled "OD - Drug Specificity"; then filter for Philadelphia, County in the year 2024 at the top of the page and click on "Any Opioids" in the graph titled "Most common drug classes contributing to cause of death, *Preliminary* 2024) (last visited May 19, 2025).

exchanged on its property. Instead, drug users would bring their own illegal drugs to use within its facilities.

In 2019, the Department of Justice began this lawsuit against Safehouse and its then-Executive Director seeking a declaration that supervised illegal drug use violates 21 U.S.C. § 856(a)(2). Later, the Department of Justice amended its complaint to name José Benitez, President of Safehouse, as a defendant. Safehouse and Benitez argued that § 856(a) does not reach their proposed conduct, that § 856(a) exceeds Congress' Commerce Clause powers, and that application of § 856(a) violates their rights under RFRA.

The District Court determined that § 856(a) did not reach Safehouse's proposed conduct. *United States v. Safehouse*, 2020 WL 906997, at *3 (E.D. Pa. Feb. 25, 2020). Section 856(a) makes it unlawful to "manage or control any place . . . and knowingly and intentionally . . . make available for use . . . the place, for the purpose of unlawfully . . . using a controlled substance." 21 U.S.C. § 856(a)(2). The District Court read "for the purpose of" as referring only to the purpose of whoever "manage[s] or control[s]" the "place" at issue. *United States v. Safehouse*, 985 F.3d 225, 232 (3d Cir. 2021) (*Safehouse I*). A divided Panel of this Court rejected that construction, read the language to refer to the purposes of third parties, and declined Safehouse's related invitation to "harmonize" our reading of the plain text with recent federal efforts to combat the opioid epidemic.[2] *Id*. at 234–39.

---

[2] The Panel unanimously rejected Safehouse's argument that § 856(a)(2) exceeded Congress' power to regulate interstate commerce. *Safehouse I*, 985 F.3d at 239; *id*. at 243 n.1 (Roth, J., dissenting in part).

On remand, the District Court was left to consider Safehouse's RFRA and Free Exercise counterclaims.[3] The government moved to dismiss those counterclaims, and the District Court granted its motion. Safehouse timely appealed. The government argues that Benitez lacks appellate standing and Safehouse asserts that the District Court erred by not granting it leave to amend its complaint.

II

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1345, and this Court has jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review of a District Court's order dismissing a party's claims under Rule 12(b)(6). *Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 350 (3d Cir. 2012). Of particular importance here, we are required to "consider only those facts alleged in the complaint and accept all of the allegations as true." *Id.* (quoting *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994)).

III

The District Court dismissed Safehouse's RFRA and Free Exercise counterclaims because "Safehouse is not a religious entity." *United States v. Safehouse*, 729 F. Supp. 3d 451, 454 (E.D. Pa. 2024). That was error because RFRA's plain text and Free Exercise doctrine are clear that those statutory and constitutional protections extend to non-natural persons, including so-called non-religious entities. In so

---

[3] Safehouse amended its complaint on remand to include a Free Exercise counterclaim. *See* App. at 184–225.

holding, we express no view about whether threatened prosecution of Safehouse substantially burdens its exercise of religion. We likewise decline Safehouse's invitation to determine in the first instance whether it has plausibly stated RFRA and Free Exercise claims. We only address the proper object of RFRA's and the First Amendment's protections: that object includes a non-natural entity allegedly exercising religion, even if the entity itself is not religious.

A

Our analysis of RFRA "begins and ends with the ordinary meaning of" its plain text. *United States v. Johnson*, 114 F.4th 148, 154 (3d Cir. 2024). RFRA says the "[g]overnment shall not substantially burden *a person's* exercise of religion even if the burden results from a rule of general applicability," unless it furthers "a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000bb-1(a)–(b) (emphasis added). RFRA's object is "persons," so Safehouse is protected if it is a "person" under RFRA.

Neither RFRA nor its sister statute, the Religious Land Use and Institutionalized Persons Act, define "person," but the Dictionary Act does. It says that in "any Act of Congress, unless the context indicates otherwise," "the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. The Supreme Court in *Hobby Lobby* "s[aw] nothing in RFRA that suggests a congressional intent to depart from the Dictionary Act definition" and neither do we. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 708 (2014). Safehouse is therefore a "person" under RFRA and eligible for its protections.

The government argues that Congressional reports in RFRA's legislative history made "no mention of protecting non-religious entities." Appellee's Br. at 11. As we said earlier, "when the text is clear, we will not look beyond it to lawmakers' statements." *Safehouse I*, 985 F.3d at 239. But the government's argument goes a step further. It asks us to conclude the plain text of a statute does not reach what Congress did not enumerate in the several Congressional reports generated during the legislative process. We decline to draw that inference. If an entity reasonably fits within the statutory language, it is of no moment that Congress did not name it in the legislative history. "'[T]he fact that [a statute] has been applied in situations not expressly anticipated by Congress' does not demonstrate ambiguity; instead, it simply 'demonstrates [the] breadth' of a legislative command." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

If there was any doubt as to whether Safehouse is a "person" under RFRA, *Hobby Lobby* eliminated it. There, the Supreme Court explained that "[n]o known understanding of the term 'person' includes *some* but not all corporations," so three closely held for-profit corporations were entitled to RFRA's protections. *Hobby Lobby*, 573 U.S. at 708.

The government in *Hobby Lobby* conceded that nonprofit corporations are persons under RFRA. *Id.* at 708 n.20. And though the Court split 5-4 on whether for-profit corporations are "persons," it was unanimous that nonprofit corporations are. *Id.* at 751–53 (Ginsburg, J., dissenting). The majority went further. It suggested that even "large, publicly traded corporations" are RFRA persons, though it would be "unlikely" for "corporate giants" to assert such claims in the

9

first place. *Id.* at 717. In such cases, the applicability of RFRA would likely hinge on sincerity. *Id.*

The District Court thus erred in determining that Safehouse can never qualify for the protections of RFRA because it is a non-religious entity. The District Court properly recognized that "corporations can be considered 'persons.'" *Safehouse*, 729 F. Supp. 3d at 456. But it improperly asked whether Safehouse is a "religious entity," *id.* at 454, 456, focusing on statements in Safehouse's incorporating documents, its website, in its application for tax-exempt status, *id.* at 455, and aspects of Pennsylvania corporate law, *id.* at 456–57. The government defends that approach on appeal. At oral argument, the government proposed the following test: a corporate entity like Safehouse is eligible for protection under RFRA only if its corporate documents bind it to operate in accordance with a religious purpose.

Whatever the merits of this framework, it has no basis in RFRA's plain text. "RFRA applies to 'a person's' exercise of religion" and Safehouse is a "person" claiming to exercise religion, so it is eligible for RFRA's protections. *Hobby Lobby*, 573 U.S. at 707 (quoting 42 U.S.C. § 2000bb-1(a)). Just as Safehouse's compassion did not shield it from the plain text of § 856(a)(2), concerns about its proposed services do not withdraw the protections of RFRA.

B

Safehouse is also protected by the Free Exercise Clause. As *Hobby Lobby* recognized, "free-exercise claims brought by nonprofit corporations" are nothing new. *Id.* at 708; *see also Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 625 (2018) ("[a] baker, in his capacity as the owner of a

business serving the public" is protected by the Free Exercise Clause). That provisions of the Bill of Rights apply to corporate entities is "well-established." *Metro. Life Ins. v. Ward*, 470 U.S. 869, 881 n.9 (1985); *see, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 353 (2010) (Free Speech Clause); *Marshall v. Barlow's Inc.*, 436 U.S. 307, 325 (1978) (Warrant Clause). Against that backdrop, there is no "non-religious entities" carveout from the First Amendment. After all, the purpose of extending rights to corporate persons is to protect the rights of natural persons acting through the corporate form. *Hobby Lobby*, 503 U.S. at 706–07. That purpose is no less true for religious exercise than it is for other rights.

IV

Next, the government contends that José Benitez lacks appellate standing because, it argues, only Safehouse asserted RFRA and Free Exercise counterclaims. That is correct. Benitez asserted RFRA as an affirmative defense, but not as a counterclaim. App. at 108, ¶3. Thus, Benitez was not aggrieved by the District Court's order and lacked standing to appeal the District Court's dismissal.

V

Finally, Safehouse argues that the District Court erred by dismissing its counterclaims without addressing its request for leave to amend its complaint. Because we reverse the District Court's holding that the protections of RFRA and the First Amendment do not extend to Safehouse, we need not address whether the District Court erred by not granting leave to amend.

\*   \*   \*

For the reasons above, we will reverse the District Court's order that Safehouse is not protected by RFRA and the Free Exercise Clause as a non-religious entity and remand for it to consider whether Safehouse has plausibly pleaded RFRA and Free Exercise counterclaims. Because Benitez was not properly joined to this appeal, we will dismiss this appeal as to him.